Jackie Barron WILSON, Appellant

v.

The STATE of Texas.

No. AP–75062.

Court of Criminal Appeals of Texas,
En Banc.

March 1, 2006.

J. Gary Hart, Austin, for Appellant.

John R. Rolater, Jr., Asst. District Atty., Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., MEYERS, KEASLER, HERVEY, and COCHRAN, JJ. join.

On January 21, 2006, appellant filed a motion for rehearing. We overrule appellant's request for rehearing, withdraw our initial opinion, and issue this corrected opinion in its stead.

In 1989, appellant was convicted of capital murder and sentenced to death. On direct appeal, a majority of this Court reversed the judgment based on an error in jury selection. *Wilson v. State*, 863 S.W.2d 59, 60 (Tex.Crim.App.1993). The cause was remanded to the trial court, and in 1994, appellant was again tried and convicted of capital murder. Pursuant to the second jury's answers to the special issues, appellant was again sentenced to death. On direct appeal from the second convic-

tion and death sentence, we affirmed the judgment of the trial court, and the United States Supreme Court denied appellant's writ of certiorari. *Wilson v. State*, 522 U.S. 829, 118 S.Ct.93, 139 L.Ed.2d 49 (U.S.Tex.1997), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1409, 158 L.Ed.2d 91 (2004). Both appellant's state and federal writs of habeas corpus were denied. *Ex parte Wilson*, WR–40,438–01 (Tex.Crim.App.1999) (not designated for publication); *Wilson v. Cockrell*, 2003 WL 21766540 (2003), *cert. denied sub nom.*, *Wilson v. Dretke*, 540 U.S. 1186, 124 S.Ct. 1409, 158 L.Ed.2d 91(2004). Appellant is before this Court now on direct appeal from the trial court's denial of his request for post-conviction DNA testing under Chapter 64 of the Code of Criminal Procedure. We will affirm.

Our holding requires a thorough recitation of the facts. The victim, who we will refer to by her nickname Maggie, was a five-year-old girl. On the morning of November 30, 1988, Maggie's body was found face-down on the side of a road in a secluded area of Grand Prairie. Her shorts had been pulled down, exposing her buttocks. It was immediately apparent that she had been run over by a car. A further examination revealed that she had been both vaginally and anally raped, strangled, and suffocated. There were tire marks on her body which reflected two distinct tire patterns. A pair of semen-stained panties were found near Maggie's body.

Investigators discovered that Maggie, who lived in an apartment complex with her mother, brother, and a live-in baby sitter,[1] had been abducted from her bed-

---

**1.** Appellant was acquainted with the family, because he was a friend of the live-in babysitter. Evidence showed that appellant had visited Maggie's apartment before and, in at least one instance, appellant "exhibited undue

interest in Maggie at a birthday party prior to the murder," as noted by the State in its brief. Moreover, evidence was admitted showing that appellant was familiar with the apartment complex because he had resided there

room at night. The window in her bedroom had been broken from the outside. Several pieces of glass recovered from inside and outside Maggie's bedroom had appellant's fingerprints on them.

Several witnesses testified that they saw appellant driving a red spray-painted Mercury Cougar on the night of the murder, and in a statement he gave police, appellant admitted to driving the car that evening. The two types of tire tracks found on Maggie's body were consistent with the two types of tires on the Cougar.[2] Thirty-eight human hairs, which were found to be microscopically consistent with Maggie's hair, were recovered from the undercarriage of the Cougar, and fibers mixed in with those hairs were consistent with the Cougar's carpet fibers. Nineteen additional hairs were recovered from inside the Cougar, and they were found to be consistent with Maggie's hair. A chest or pubic hair recovered from Maggie's genitalia was consistent with a racial group that includes Hispanics; appellant is Hispanic.

Additional evidence in support of the State's theory involved a similar crime committed by appellant the same evening that Maggie was murdered. Namely, an additional complainant from the same apartment complex testified that appellant broke into her apartment and sexually assaulted her as she slept on the couch. When she awoke, she ordered appellant to leave. The complainant testified that it appeared that appellant had entered through a window. He offered her drugs in exchange for sex; declining, she again ordered appellant to leave, which he did.

There was also testimony from several witnesses who saw appellant drive toward the apartment complex (instead of heading home in the other direction) just before midnight the evening of Maggie's murder. These witnesses further testified that appellant had been drinking heavily and using cocaine before he departed. When investigators were given appellant's name by another child living in the apartment complex, a police officer went to appellant's residence to question him. Upon the officer's arrival, appellant fled.

In sum, there was ample physical and circumstantial evidence tying appellant to the murder; he was placed at the scene of the murder; he confessed to driving the red spray-painted car that ran over Maggie's body; and he committed a similar sex crime, using the same method (entering through a window), just before abducting Maggie.[3]

Despite the overwhelming evidence connecting appellant to the kidnapping and murder of Maggie, appellant requested that the trial court order additional testing of certain pieces of evidence, including the hair evidence, the anal swab and smear, blood, and tissue samples. The trial court denied his request, finding that "the defendant has failed to meet the requirements of Chapter 64 for forensic DNA testing."

sometime before the murder. The live-in babysitter testified that he had never allowed appellant into the children's bedrooms. The live-in babysitter was eliminated as a suspect based on hair, blood, and fingerprint samples he voluntarily submitted to investigators prior to trial.

2. The evidence at trial showed that there was one Nitto brand tire and three Goodyear brand Eagle GT tires on the Cougar. There were fifteen points of comparison between the Nitto tire and the tread print on Maggie's leg. There were six points of comparison between the tread print on Maggie's back and the Goodyear tires.

3. Additional evidence was admitted at the punishment phase of trial showing that appellant had previously abducted and sexually assaulted a woman by drugging her drink while patronizing a bar in Lubbock.

Appellant appeals the trial court's ruling to this Court and complains (1) that some of the State's biological evidence, which it admits is still in its possession and has never been tested, would exonerate appellant, and (2) that had the more "sophisticated and discriminating" forms of DNA testing been available during appellant's second trial, he would not have been convicted. Specifically, appellant avers that the 2003 amendments to Chapter 64 have "abrogated this Court's more onerous construction of Article 64.03(a)(2)(A)," and if the testing were to show that "it was all the DNA of some other perpetrator, not Wilson, then it is at least more likely than not that Wilson would not have been convicted." *See* Act of May 9, 2003, 78th Leg. R.S., ch. 13, § 3, 2003 Tex. Gen. Laws 16; TEX.CODE CRIM. PROC ANN. art. 64.03(a)(2)(A) (Vernon Supp.2005).

■ The State responds that appellant is not entitled to additional DNA testing because identity was not an issue in this case, and appellant would not be able to show that he would not have been convicted if the additional testing were performed. The parties agree that our review is *de novo*. *See, e.g., Rivera v. State*, 89 S.W.3d 55, 59 (Tex.Crim.App.2002). Applying a *de novo* standard of review, we conclude that appellant is not entitled to new testing under Chapter 64. *Skinner v. State*, 122 S.W.3d 808, 813 (Tex.Crim.App. 2003).

To be entitled to post-conviction DNA testing under Chapter 64 of the Code of Criminal Procedure, appellant bears the burden of establishing, by a preponderance of the evidence, that he "would not have been convicted if exculpatory results had been obtained through DNA testing." *See* TEX.CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A) (Vernon Supp.2005); *Smith v. State*, 165 S.W.3d 361, 363–64 (Tex. Crim.App.2005).[4] Appellant must also show that identity was or is an issue in the case. *See* TEX.CODE CRIM. PROC. ANN. art. 64.03(a)(1)(A)(i).

The State argues that appellant is not entitled to the relief he seeks because identity is not and was not an issue in this case.[5] This is a point well-taken because

**4.** At oral argument and in his brief on the merits, appellant argued that the legislative amendments to Chapter 64 would permit the additional testing he now requests, where before, under our holding in *Kutzner v. State*, 75 S.W.3d 427, 439 (Tex.Crim.App.2002), he would not have been entitled to the tests. As we explained in *Smith*, the Legislature amended Chapter 64 in response to our holding in *Kutzner* and relaxed the standard to a preponderance of the evidence. *Smith*, 165 S.W.3d at 363–64; *see* Act of May 9, 2003, 78th Leg. R.S., ch. 13, § 3, 2003 Tex. Gen. Laws 16. But even when considering the undisputed facts of this case under the more relaxed standard, appellant could not have met his burden of proof. That is, the evidence does not preponderate in appellant's favor that he would not have been convicted if the blood, hair, semen, or tissue samples produced exculpatory results. *See Whitaker v. State*, 160 S.W.3d 5, 9 (Tex.Crim.App.2004).

**5.** Citing to *In re McBride*, 82 S.W.3d 395, 397 (Tex.App.-Austin 2002, no pet.) (identity not at issue where prior DNA test inculpated McBride, even though not admitted into evidence); *Hart v. State*, 2004 WL 199271, at *3, 2004 Tex.App. Lexis 1006 at *9 (Tex.App.-San Antonio 2004, no pet.) (not designated for publication) (identity not at issue where defendant's fingerprints at the crime scene); *Eubanks v. State*, 113 S.W.3d 562, 566 n. 1 (Tex.App.-Dallas 2003, no pet.) (noting that identity was not an issue at trial where victim was defendant's daughter); *Morris v. State*, 110 S.W.3d 100, 103 (Tex.App.-Eastland 2003, pet. ref'd) (holding identity not at issue where victim knew defendant because defendant was victim's mother's long-term boyfriend). The State also cites to cases where courts have held that post-conviction DNA testing is not obligatory where the appellant did not challenge the sufficiency of the evidence on appeal, as appellant chose not to do here. *See Green v. State*, 100 S.W.3d 344, 345 (Tex.App.-San Antonio 2002, no pet.) (holding

appellant has never challenged the issue of identity. In none of appellant's various direct and post-conviction appeals, in neither of his trials, nor here, does appellant claim that the State was prosecuting the wrong man. *See id.* art. 64.03(a)(1)(B). Rather, he avers he is entitled to new testing or retesting of evidence because there may have been an *additional* man involved in the abduction, rape, and murder of Maggie. Even if there was another person who aided appellant and has successfully evaded prosecution after all these years, it would have no effect whatsoever on appellant's conviction and sentence. *See* TEX. PEN.CODE ANN. § 7.02(a)(2). In addition to the fingerprint evidence implicating appellant, there was ample evidence from a variety of sources showing that appellant had a history of abduction and sexual assault, that he was driving the car which ran over Maggie, that he was seen at the apartment complex shortly before Maggie was abducted, and he committed a sexual assault against another victim at the same apartment complex on the same evening. Even if we accept the premise that identity is an issue, the above-mentioned overwhelming evidence shows that the trial court did not err in denying relief. *See id.* art. 64.03(a)(1)(B) (2005); *Skinner v. State,* 122 S.W.3d at 813; *see e.g., Bell v. State,* 90 S.W.3d 301, 308 (Tex.Crim.App. 2002).

■ As noted, appellant's conviction of capital murder was based on murder committed in the course of a kidnapping. *See* TEX. PEN.CODE ANN. § 19.03(a)(2). Therefore, whether testing on the semen, hairs, or the anal swab would indicate that Maggie was raped by another person, presumably a party to the kidnapping, would be wholly irrelevant. *See Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App.1991); TEX. PEN.CODE ANN. § 7.02(a)(2).[6]

■ Similarly, appellant's request to test the blood found in Maggie's bedroom and on some of the glass recovered from inside and outside her bedroom, again, would not affect the result in this case. That is, if newer, more discriminating DNA testing showed that another perpetrator was involved, that finding would not exonerate appellant because it would show nothing more than there was another party to the crime, at best. *See* TEX. PEN. CODE ANN. § 7.02(a)(2); *Whitaker v. State,* 160 S.W.3d 5, 9 (Tex.Crim.App.2004). Appellant's fingerprints were located on the panes of glass in a way that indicated he removed the glass from its frame (finger and thumb prints placed on opposite sides of the perimeter of the pane of glass). This evidence, coupled with the fact that Maggie's babysitter testified that he had never allowed appellant into Maggie's room, placed appellant at the scene of the abduction. Thus, further testing of the blood found in Maggie's room would not be

---

identity not at issue where appellate challenge to sufficiency of the evidence directed to an element other than identity); *McBride,* 82 S.W.3d at 397 (noting same). The State further points out that applicant as much as conceded the issue of identity in his state application for habeas corpus relief in writing: "The forensic evidence circumstantially connected him with Maggie's death by showing he apparently handled the broken glass from her bedroom window, that it was he who anally raped her, and that she was run over by the car he was driving that night."

6. It is important to note that the anal swab appellant wants re-tested had already been tested, and that result showed a DNA profile matching appellant's DNA profile—only 1 in 2083 Hispanics would match this profile. What is more, appellant has not explained how the newer more discerning DNA test would cast doubt on the reliability of the earlier test.

favorable to appellant. *See Whitaker*, 160 S.W.3d at 9.

Blood-typing tests were performed on some of the blood stains found in Maggie's room and they matched Maggie's blood-type. *See id.* Similarly, if DNA testing showed the remaining blood was not appellant's or Maggie's, but that of some other person, the fingerprint evidence independently established that appellant abducted Maggie from her bedroom. This evidence is sufficient to show that appellant could not have met his burden for DNA testing under the more relaxed standard of Chapter 64. *See* Act of May 9, 2003, 78th Leg. R.S., ch. 13, § 3, 2003 Tex. Gen. Laws 16; TEX.CODE CRIM. PROC ANN. art. 64.03(a)(2)(A) (Vernon Supp.2005).

■ Also wholly without merit is appellant's assertion that newer tests should be conducted on the 19 hairs found inside and 38 hairs found lodged outside the car appellant was seen driving the night of the murder. The initial tests, conducted near the time of the second trial, showed that all of the recovered hairs were consistent with Maggie's hair. In addition to all the other evidence inculpating appellant, a newer more discriminating test on these hairs would not produce evidence that would exonerate appellant. In any event, if the tests showed that the hairs belonged to some other person, evidence still sup-

ported that appellant was at the scene of the abduction and he was driving the car that ran over Maggie.[7] *Kitchens v. State*, 823 S.W.2d at 258.

In conclusion, even if we were to order that all the evidence be retested, and all the results were consistent with appellant's theory (that the tests would show an additional perpetrator was involved in the crime), appellant could not meet his burden of establishing, by a preponderance of the evidence, that he would not have been convicted of murder in the course of kidnapping. TEX.CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A) (Vernon Supp.2005). We affirm the ruling of the trial court.

JOHNSON, J., filed a concurring opinion.

PRICE and WOMACK, JJ., dissent.

JOHNSON, J., filed a concurring opinion.[1]

Numbers flummox many of us, and as a result, numerical evidence can become confusing and misleading. This is particularly true if the evidence that inserts numbers into the legal equation is new and marginally understood. We are now at that point with evaluation of DNA evidence. The experts who come to court to present DNA evidence frequently come up with probabilities[2] of such great magnitude that they

---

7. Moreover, it is simply commonsensical that the hairs recovered from the undercarriage of the Cougar belonged to Maggie, as tire-print evidence firmly established that she was run over by the Cougar. The same logical conclusion can be drawn about the tissue found underneath the car that appellant wants tested. Because it was firmly established that the Cougar ran over Maggie's body, it would be ludicrous to test the tissue sample evidence. That is, due to the other evidence firmly establishing appellant's guilt, appellant cannot show that he would not have been convicted if the testing on the hair and tissue samples produced exculpatory results. *See* TEX.CODE

CRIM. PROC. ANN. 64.03(a)(2)(A) (Vernon Supp. 2005).

1. In response to a motion for rehearing, the Court has withdrawn its original opinion and substituted a corrected opinion. This concurring opinion accompanied the original opinion of the Court and is reissued in order to accompany the corrected opinion.

2. In this context, a probability is the likelihood that the DNA of a randomly selected person will match the DNA of a known sample.

are patently unsupportable to those who understand numbers and very impressive to those who do not. **The following discussion assumes that the only evidence linking the defendant to the offense is DNA.**

The first probability mistake that experts make is to treat all variables [3] as independent. A variable is independent if, when the numerical value of the variable changes, no other variables *necessarily* change also. In a rectangle, height and width are independent variables; changing the height does not *necessarily* change the width. A dependent variable is one that *necessarily* changes in response to a change in another variable. The area of a rectangle is the product of multiplying height times width and is a dependent variable; if the height or width changes, the area *necessarily* changes.

The probability of two independent variables occurring at the same time is the product of the probabilities for each: if each variable occurs one time in ten, the probability of both variables occurring at the same time is $1/10 \times 1/10$, or $1/100 =$ one in one hundred. Probabilities decrease rapidly with the number of variables. With only six independent variables that have individual probabilities of one in ten, the probability of all occurring at once is one in a million. The probability decreases even more rapidly for variables that occur less often than one in ten times; for variables that occur once in a hundred times, the probability of one in a million requires only three variables.

A problem arises when dependent variables are treated like independent ones. In a California case from 1964,[4] *The People v. Collins,* an older woman returning from the grocery was accosted from behind and did not see her attacker, who took her purse. She did see a young woman running from the scene and described her as weighing about 145 pounds, wearing "something dark," and having blonde hair that was lighter than Janet Collins's hair was at the time of trial. A man who had been nearby reported seeing a young white woman with a blonde ponytail running from the direction of the robbery, but did not see the offense occur. He described the woman as slightly over 5 feet tall, of ordinary build, wearing a dark blonde ponytail and dark clothing. He also reported that the young woman got into a yellow or partly yellow car driven by a black man who had a beard and moustache.

The defendants, an interracial couple, were arrested and charged because they "sort of" matched the physical descriptions, owned a car that was at least partly yellow, were newly married, jobless, and broke. They denied involvement and provided an alibi. At trial, the state presented a mathematics instructor from a state college as their expert witness on the probability that the defendants were guilty. The witness refused to assign probabilities to the various factors chosen by the prosecutor, so the prosecutor proposed "probabilities" of his own; one in three young women were blonde, one in ten wore a ponytail, one in ten cars was at least partly yellow, one in ten black men had a beard, one in four men had a moustache, and one in a thousand couples was interracial.[5] The prosecutor then multi-

---

3. In a defined system, a variable is a characteristic that has a numerical value that changes.

4. 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (Cal.1968) (reversed and remanded for a new trial).

5. In 1964, the probability of a young woman having a ponytail was probably higher that

plied his own "probabilities" together and calculated that the profile would match one in 12 million couples.[6] The Collinses were convicted of the robbery based on the claimed probability that no other couple in California matched the reported description of the perpetrators.

In reversing the conviction in 1968, the California Supreme Court noted that the evidence was presented "[w]ithout presenting any statistical evidence whatsoever in support of the probabilities for the factors selected." *Collins*, 438 P.2d at 36 n9. The Court also noted that all of the selected factors were treated as independent and factually true and that there was no adjustment for dependent variables or the possibility of mistake. *Id.* at 39. Most men with beards also have moustaches, so a correction for the overlap was necessary. *Id.* at 39 n15. The Supreme Court also noted that the witness had failed to consider other plausible possibilities, for example, the young woman was a light-skinned African–American with bleached hair.[7]

Some of the bad guesses increased probability, others decreased it, but the expressed probability itself was not reliable. "Mathematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in the search for truth, must not cast a spell over him." *Id.* at 33. The *Collins* Court also noted that, even if one accepted the prosecutor's guesses, appropriate calculations indicated that there was a substantial probability that more than one other couple matched the selected factors. *Id.* at 43.

Multiplying the probabilities of all variables together, without regard to dependence, leads to a probability that is too small, often greatly too small. For example, variable A has a probability of occurring one time in one thousand, and *always* occurs with variable B. B *always* occurs with A. A and B are dependent variables, and the probability that A and B will occur together is still one in one thousand, because they never occur separately. If the probabilities of a random match to A and B are improperly multiplied together, the probability of both A and B occurring together is $1/1000 \times 1/1000 = 1/1,000,000$, or one in a million, and is one thousand times too small. The numbers soon get out of hand. One expert testified that a given profile occurred one time in 2.578 sextillion (2.578 followed by 21 zeroes),[8] a number larger than the number of known stars in the universe (estimated at one sextillion).[9] The population of Earth is

---

one in ten, but even in California, the incidence of natural blondes was likely to be less than one in three. Except for taxis, yellow cars are uncommon; probably, many fewer that one in ten non-taxi cars were yellow. In 1964, the number of interracial couples was probably far fewer than one in a thousand.

6. He then performed the "prosecutor's fallacy." *Post, infra*.

7. Other possibilities include: the young woman wore a blonde wig; she was running, not because she ha d robbed the older woman, but because she was late; she and the driver were merely car-pooling and were not a couple; the perpetrators were not from California.

8. *See, e.g. Ex parte Russeau*, No. WR–61,389–01 (Tex.Crim.App. writ application pending) (trial court's findings of fact and conclusions of law, p. 38) ("1 in 115.6 quintillion for Caucasians, 1 in 10.28 quintillion for blacks, and 1 in 1.578 sextillion for Hispanics."); *Benford v. State*, 2005 WL 240611, 2005 Tex. App. LEXIS 840, No. 03–02–00686–CR (Tex. App.-Austin, delivered February 3, 2005, unpublished, pet ref'd) ("1 in 8.77 trillion [in the Caucasian population], 1 in 7.46 trillion for African–Americans, and 1 in 4.52 trillion for Hispanics").

9. http://imagine.gsfc.nasa.gov/docs/ask_astro/answers/ 970115.html. "We believe that there are on the order of $10^{21}$ stars in our universe."

about 6.5 billion, so anything in the sextillion range is more than one trillion times larger than the population of Earth. It is no wonder that, faced with numbers too large to conceive, some juries simply dismiss DNA evidence as not helpful, not persuasive, or not credible. The other side of the coin is a jury that accepts any claim about probabilities "because it's DNA." They have all seen "CSI: Crime Scene Investigation" or "NCIS" and "know" that DNA is infallible.

The reality of the human genome is that some genes are recessive and are therefore dependent on other genes for expression. For example, blue eyes occur only if both parents pass on the gene for blue eyes. If one parent passes a gene for brown eyes, the probability is high that the child's eyes will not be blue. Many genes are intertwined to some degree; blue eyes often accompany blonde hair, but some Irish have strikingly blue eyes and black or red hair. It is very difficult to determine the probability of a given characteristic because we do not have a map of how each gene affects every other gene. It may be that one in ten people have blue eyes and one in twenty is (really) blonde, but because we know that the probability of blue eyes increases if the person is blonde, simply multiplying $1/10 \times 1/20$ will not tell us the true probability of having both blue eyes and blonde hair; the calculated value will be too low. If you are Japanese, there is close to a one hundred percent probability that you will have dark hair and brown eyes. When the probability of a person of Japanese ancestry having both dark hair and brown eyes is calculated, we must take that into account. All of these characteristics are controlled by DNA, and the same rules that apply to any

probability calculation also apply to calculating the probabilities of a DNA match; if areas A and B of each DNA sample match, but A and B *always* occur together, A and B must be treated as one area of matching, not two.

In this case, the claim at trial was that only 1 in 2,083 persons of Hispanic descent would match appellant's DNA profile. How was that number calculated? We do not know. An even more basic question is: what makes one "Hispanic"? Appellant's surname is Wilson, a name not ordinarily thought to be Hispanic. May we assume that appellant's father was not Hispanic? Part Hispanic? Part African–American? Part Western European? Eastern European? Asian? Were the differing probabilities of a non-Hispanic gene pool taken into account in calculating probabilities? How are probabilities for racial groups calculated in general? How do we calculate reasonably accurate probabilities for people like that famous self-described "Cablinasian," Tiger Woods?[10] We do not know.

Secondly, a statement that the DNA profile of the defendant occurs in only one in one million members of a given racial group means just that: if the reference group is one million individuals, one person will match; if you have two million individuals in the reference group, two individuals will match, and so on. Unfortunately, most people translate that statement, that only one person in a million matches the profile, to mean that there is one chance in a million that the defendant is *not* guilty. Statistically, however, a city with ten million members of the reference group will include ten individuals who match the profile, and thus, there is only a one in ten chance that the defendant *is* guilty.

---

**10.** Mr. Woods's father has Caucasian, African–American, Asian, and First People ancestors. His mother is Thai.

In this case, the offense occurred in Dallas County. Assuming a county population of one million and an Hispanic population of thirty percent, 300,000 Hispanics live in Dallas County. DNA is very reliable as to gender, so if we assume equal occurrence of gender, there are 150,000 Hispanic males in Dallas County. Dividing 150,000 by 2083, we find that, statistically, 72 men in Dallas County fit the profile. But do we really know that the perpetrator lived in Dallas County? Dallas is part of the Metroplex, which has a population of more than 3 million, and we are a mobile society. In the Metroplex, there are 216 statistical men who fit the profile. Could he be visiting from Houston (216 men) or Chicago (360 men)? Assuming that Mexico City is close to 100% Hispanic, 5,281 men in that city alone match the profile. How many male residents of Mexico City (or Guadalajara, Ciudad Juarez, Acapulco, etc.) were in Dallas County at the time of the offense? Even if we restrict the possibilities to Dallas County, a stated probability that only one Hispanic in 2,083 matches this profile does not mean that there is one chance in 2,083 that he is *not* guilty; it means that the probability is one in 72 that he *is* guilty.

Finally, trial attorneys need to understand how to validate (or repudiate) DNA evidence. They must begin with the reported match. Prosecutors may leap from a lab report saying that the samples match to an immediate conclusion that the defendant is guilty, thus the origin of the term "prosecutor's fallacy." [11] But is it really a match? How many areas of the DNA strands coincide? [12] How big is the specified error range? Just as for fingerprints, the more areas that match, the more likely that this is truly a match.[13] If there ap-

11. "The attorney and social psychologist William Thompson and his student Edward Schumann seem to have coined the term 'prosecutor's fallacy.'" GERD GIGERENZER, CALCULATED RISKS 154 (2002).

12. DNA analysis scans fragments in 13 areas of high variability. High probability of a true match is assumed if four to five areas match. *See* www.ornl.gov /sci/techresources/Human_Genome/home.shtml, a site funded by the United States Department of Energy Office of Science. Given that only the individual whose DNA it is will match all 13 tested areas, using an explanation of the probability of a random match that is expressed in terms of how many areas match and the closeness of the matches instead of using statistics may be more persuasive to the finder of facts. Many people feel as Benjamin Disraeli did when he said, "There are three kinds of lies: lies, damn lies, and statistics."

13. The form of the DNA molecule is a double helix, similar in structure to a loosely coiled ladder with two long, continuous "legs" and many "rungs." Nuclear DNA has four nitrogenous bases, referred to A, C, G, and T. Each base matches with only one other base, but because the sequence is directional, the order of the bases matters: A + T and G + C are different from T + A and C + G. The bases are arranged in varying sequences from rung to rung and the sequencing order encodes genetic information. By way of simplistic explanation, in a laboratory analysis DNA strands are broken into fragments, which are separated by electrophoresis, placed on a nylon membrane, and x-rayed. The result is an autoradiogram, a series of bands that resemble the bars of a UPC, but are less well delineated. Because the bands are not sharply defined, a match may be found when the bands in two samples align within a stated margin of error. As the allowed margin of error becomes larger, the statistical reliability of the match becomes smaller. The nuclear DNA strands that are analyzed are "non-coding" sections, that is, nuclear DNA that has no known function in the production of protein. Non-coding nuclear DNA has less selection pressure than coding nuclear DNA and therefore shows higher variability among individuals. Higher variability makes it easier to exclude or include individuals. Mitochondrial DNA goes even further toward identifying individuals because it is separate from nuclear DNA and different from it in that mitochondrial DNA comes solely from the mother and is therefore a clone of her mitochondrial DNA rather than a

pears to be a match, advocates then need to discover how often the laboratory that did the DNA testing produces a false positive.[14] Part of the problem for the State of California in the O.J. Simpson trial was the revelation that the state's testing laboratory had a false positive rate of 1 in 200, that is, one match in 200 was not, in fact, a match, thus opening the door for the defense to argue that the sample really did not match Simpson's DNA.[15]

Once it is established by the state that the two samples do, in fact, match within an appropriate margin of error, the next question is whether the defendant is the source. The random probabilities that are routinely used are valid only for unrelated persons. The closer the relative, the greater the number of areas on the DNA strand that will match. Identical twins have identical DNA. Parents will share DNA similarities with their children, and siblings will have many commonalities. Double first cousins will also have many commonalities; first cousins will have fewer commonalities, yet still a significant number. The only living male in a given family has a high probability of being the source, but a family with only sons over several generations will present a greater challenge. If the state shows that the defendant is the source, there is one more hurdle; can the defendant be placed at the crime scene in the appropriate time frame?

DNA is durable; it does not evaporate or dissipate, and the time at which it was deposited on a surface cannot be directly determined. If the DNA sample was re-trieved from a place where the defendant lives, works, or visits frequently, it is probably not probative, as one would expect to find the defendant's DNA in those places. Sex crimes aside, if the sample is from a place where the defendant should not have been, the DNA, by itself, can confirm only that he was there at some time and cannot, by itself, prove conclusively that he was there at the time of the crime. By the same token, DNA cannot prove that the defendant was *not* there at the time of the crime.

DNA analysis is a powerful tool in determining guilt or innocence, and usually there is other evidence that links the defendant to the offense, but we must remember that DNA analysis is performed by humans and is not foolproof, nor are the conclusions drawn from the analysis always correct. Only if all the prerequisites for reliability—true match, correct source, and presence at the crime scene in the applicable time frame—are satisfied can society have confidence that the DNA evidence is, in and of itself, strong enough to support a conviction.

I concur in the judgment of the Court.

---

blending of the nuclear DNA from both parents. One of its uses is to differentiate between person who have different mothers, such as paternal half siblings, or cousins, or fathers and sons. The Y chromosome, present only in males, is passed directly from father to son and may offer similar information for males.

14. A false positive is a test result that indicates that a factor is present, but in fact it is not. *E.g.*, a blood test indicate that the person is HIV positive, but in fact the person is not infected.

15. GERD GIGERENZER, CALCULATED RISKS 167 (2002).