Opinion issued August 30, 2007

















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00043-CR

____________


EDWARD ESPARZA, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 263rd District Court

Harris County, Texas

Trial Court Cause No. 9406505






O P I N I O N

 A jury found appellant, Edward Esparza, guilty of the offense of aggravated
sexual assault. (1) This Court, in an unpublished opinion, affirmed appellant's
conviction, but remanded for a new trial on punishment only. (2) On remand, a second
jury assessed punishment at confinement for life, and the Fourteenth Court of Appeals
affirmed appellant's sentence in an unpublished opinion. (3) Subsequently, appellant
filed a motion for post-conviction DNA testing, which the convicting court denied on
September 27, 2005. (4) In his sole point of error, appellant contends that the convicting
court erred in denying his motion for post-conviction DNA testing. 

 We affirm.

Factual and Procedural Background


 At trial, Hermina Cantu Lucero, the complainant's aunt, testified that on the
evening of January 1, 1994, she, the complainant, the complainant's sister, Mary
Cantu, and "some other members of the family and friends" went to a nightclub in
Houston around 9:30 or 10:00 p.m. Lucero and the complainant were living in Bryan,
Texas at the time and drove into Houston for the night. While at the nightclub,
appellant was standing near where Lucero was standing, and she noticed that
appellant "kept starting and eventually he came and asked [her] to dance." Lucero
explained that this occurred around 10:30 or 11:00 p.m. The two danced several
times, appellant bought her a drink, and they talked for "a couple of hours." When
Lucero, appellant, and the complainant were leaving the club between 1:30 and 2:00
a.m., Lucero noticed that the complainant's car had been towed. The three then went
back inside the club and discovered the location to which the car had been towed. 

 Lucero stated that appellant volunteered to drive Lucero and the complainant
to the tow yard, and the three followed Cantu and her friend there. Upon arriving at
the tow yard, they realized that they did not have enough money to pay the impound
fee. Lucero and the complainant had to return to Bryan because the complainant had
to be back at 6:00 a.m. to go to work, and they accepted appellant's offer to drive
them back to Bryan. 

 With Lucero in the front passenger seat and the complainant in the backseat,
the two gave appellant directions to Bryan. As they were traveling on Highway 290
toward Bryan, Lucero woke the complainant and told her that she "was really scared"
and appellant "was acting weird." Lucero explained that when she woke the
complainant, the complainant did not appear to be oriented as to where she was or
understand what was going on. The complainant was "still half asleep" and "not
really coherent to what [was] going on at that time."

 Lucero eventually managed to get out of the car and "took off running to the
highway because cars were coming and [she] wanted to get help." When Lucero
looked back, she saw that the complainant was still in the backseat and appellant was
out of the car. When Lucero saw appellant get out of the car, she "had a feeling he
was coming after [her], so [she] ran to the other side where the other oncoming cars
were coming." After no one offered to stop to assist her, Lucero "took [her] shoes off
and [she] continued running" and stopped at the first house she came to. Lucero told
the residents that the complainant was in danger and to call for emergency assistance. 
When police officers arrived at the residence, Lucero explained what had happened,
gave the officers appellant's business card that he had given her, which contained his
name printed on the card, and asked them to help her find the complainant. After an
officer called in the complaint, he learned that the complainant had already been
found and taken to a hospital.

 The complainant testified that as they were driving to Bryan, she fell asleep in
the backseat of the car, and the "next thing [she] knew [she] was waking up because
[they] were pulled over." After Lucero escaped, appellant came back to the car, got
in the driver's seat, and told the complainant that if she got in the front seat and did
what he told her to do, she would be alright. The complainant climbed backwards
into the front seat, and appellant told her to put her head down. She explained that
she still had not gotten a good look at appellant. As she faced the dashboard,
appellant "laid his hand over" the complainant "as if he was using [her] head as an
arm rest."

 As appellant drove back toward Houston, the complainant was crying, and
appellant "started being nice" and told her that "he wasn't going to hurt" her and
would "take [her] back into town and drop [her] off somewhere." Then, appellant
pulled over the car,"reclined his seat back a little bit," and "unzipped his pants." The
complainant explained that she "knew something was going to happen." They were
in a dark area, appellant "withdrew his penis and he told [the complainant] he knew
[she] did this with [her] husband." Appellant "drew [the complainant] closer to him
and he put [her] head between his legs and he stuck his penis in [her] mouth and the
thought made [her] gag and [she] kept gagging." Appellant told the complainant that
"if [she] threw up on him, [she] would be sorry . . . [a]nd he would hurt [her] really
bad." Appellant then told the complainant "to roll over on [her] stomach and pull
[her] pants down." He "reclined the passenger's seat and he pushed [her], to roll over
on [her] stomach, and [she] had [her] head turned toward the passenger's window,
looking out that way, and [she] knew he had climbed on top of [her] from behind." 
Appellant got on top of the complainant and began having vaginal intercourse. The
complainant explained that at no time was the vaginal or oral intercourse consensual.

 The complainant stated that "[o]nce he had finished and he pulled out, he asked
me if I had come, if I had come when he came. And I told him yes I had because I
figured if I told him no, he would start all over again and I didn't want to go through
it again." After appellant "was done," he picked up a bandana, poured Coke over it,
and told the complainant "to make sure [she] cleaned [herself] well." The
complainant explained that she cleaned herself, but not in the manner that appellant
had ordered. Appellant told the complainant that he was going to drop her off and for
her "to phone somebody, anybody, he didn't care who, just as long as it wasn't the
police because he made" the complainant give him her Texas Driver's License and
he memorized the information. 

 The complainant further testified that appellant then drove back into town,
"stopped at [a] corner and he told [the complainant] not to look at him, not to look at
the car and to walk away in the opposite direction that he drives." After appellant
drove off, the complainant walked to a convenience store and called for emergency
assistance. When police officers arrived, the complainant explained what had
happened, and was taken to a hospital for a rape kit. When questioned as to whether
she could identify her attacker, she explained that she did not "remember what he
looked like" because she never got a good look at his face while they were at the club
and, while in the car, she was never able to "get a good look at him" because he kept
her "face down." The complainant stated that she knew appellant had raped her
because Lucero and Cantu identified appellant as the man in the car and "[h]e was the
only person the whole time in the car."

 Mary Cantu, the complainant's sister, testified that appellant was the man that
left the nightclub with Lucero and the complainant. 

 Harris County Sheriff's Deputy D.R. Warren testified that during the early
morning hours of January 2, 1994, he was dispatched to a sexual assault call in
Hockley, Texas. Warren explained that upon his arrival, Lucero told him of the last
location where she had seen appellant and the complainant. When Warren arrived at
that location, he "received a call from another officer from L.B.[J.] Hospital that they
had" the complainant. Lucero gave Warren appellant's business card. 

 Emilia Leiva, appellant's wife, with the assistance of a Spanish translator,
testified that on the evening of January 1, 1994, she and appellant went to her sister's
house around 8:00 p.m. "or a little after" and were there with family and friends "until
about 2:15, 2:45 or 2:30." She described appellant as wearing a "plaid shirt, some
khaki pants and some black shoes."

 Freddy Galvan, Emilia's brother-in-law, with the assistance of a Spanish
translator, testified that Emilia and appellant arrived at his house "between 8:00 and
8:30" on January 1, 1994. The three then went to the house of a friend, Misael Rivas,
and they "were there for about an hour, while they got dressed, and then [they] came
home." When they arrived "at home," they were making plans because [they] wanted
to go [out] and then it was late and [they] stayed there at home." According to
Galvan, Emilia and appellant left Galvan's house around 1:00 or 1:30 a.m.

 Misael Rivas, with the assistance of a Spanish translator, testified that on
January 1, 1994, Galvan, Emilia, and appellant arrived at Rivas's home at around
9:00 or 10:00 p.m. They were there for approximately one to one and one-half of an
hour, and then decided to go to Galvan's house. After they all went to Galvan's
house, Rivas returned home between 11:00 and 11:30 p.m. Rivas stated that Galvan,
Emilia, and appellant remained at Galvan's house after Rivas left.

 Milagro Leiva, appellant's sister-in-law, with the assistance of a Spanish
translator, testified that she hosted a party at her house on the evening of January 1,
1994. At around 8:00 or 9:00 p.m., appellant, Emilia, Milagro, and her family were
present. Rivas and his family arrived at Milagro's house around 9:00 or 10:00 p.m. 
According to Milagro, Rivas and his family left around 11:00 p.m., and appellant and
Emilia left around 1:00 or 2:00 a.m.

 Before the defense rested, at a bench conference, the following exchange
occurred, 

[Appellant's counsel]: At this time I would respectfully request leave
of the Court that it's time to give a reasonable
amount of time to subpoena or try to bring in
Pamela McGinnis along with the rape kit.


[Court]: Have you made that contact with her?


[Appellant's counsel]: No, we have not made contact with her.


[Court]: What do you expect?


[Appellant's counsel]: Well, basically, as I understand, her testimony
was unable to link. Her testimony is not
going to be able to link along with commit
any rape that evening. I believe I read in the
offense report where [the complainant] had
sex a day or two before this and they had
found some vaginal smears, some sperm, and
I just want to [sic].


[Court]: What hospital does she work in?


 [Appellant's counsel]: She don't work at an office. She works at the
[Medical Examiner's] Office.


[State]: And I have a question, you are saying this
evidence somehow clears your client?


[Appellant's counsel]: No, but it would help elicit.


[State]: In what way?


[Appellant's counsel]: It did have a swab and a smear. There was
testimony by [the complainant] that she had
applied some Coca Cola on a bandana, that
she attempted to clean up, that she didn't
clean herself out and that I want the jury to
hear her testiomny [sic] from the individual
that conducted the examination of the
complaining witness following the rape.


[Court]: What would she testify to bearing on this
case?


[State]: The semen was found inside.


[Appellant's counsel]: No, the semen was found on the cotton swab
but it [is] inconclusive. 


[State]: I'l [sic] show you the report. That's not what
it says.


The trial court indicated that if Pamela McGinnis was not present in court by a certain
time, then appellant would rest at that time. McGinnis never testified at trial.

 Following his conviction, appellant, acting pro se, filed a motion for DNA
testing and appointment of counsel. (5) In his motion, appellant asserted that (1) "DNA
testing is necessary because the evidence was not DNA-tested, and counsel did not
file a motion for DNA-testing at that time"; (2) "it was through no fault of his own
that the forensic evidence was not tested, and such testing would have shown him
innocent of having committed an aggravated sexual assault"; (3) "if DNA testing
were to be conducted there would be no re-trial of the aggravated sexual assault
charge due to Movant's establishment of his innocence of that charge"; and (4) "in
the interests of justice, DNA testing of the forensic evidence is necessary for the
establishment of Movant's actual innocence of the offense charged and the resultant
sentence imposed due to said allegation." In his attached affidavit, appellant testified
that a "DNA test of the forensic evidence gathered at the time of the alleged
occurrence of the offense . . . will reveal that [he] [is] not the perpetrator of said
offense."

 The State conceded that it still had the evidence in custody, but requested that
the trial court deny the motion for DNA testing because appellant failed to establish
"by a preponderance of the evidence that he would not have been convicted if
exculpatory evidence had been obtained through DNA testing." Additionally, the
State asserted that "the appellate record contains assertions made by [appellant's] trial
counsel, who stated that the complainant had sexual relations a day or two prior to the
sexual assault offense as reflected in [a] . . . bench conference outside the hearing of
the jury." Additionally, the trial prosecutor submitted an affidavit in which he
testified that the offense report reflected that the complainant reported that she had
sex two days prior to the instant offense. Assuming that another unknown male's
DNA was found present, and not appellant's, the State argued that such "seemingly
favorable test results would not constitute exculpatory evidence" because "[a]ny
DNA not contributed by [appellant] could be attributed to the person with whom the
complainant had sex prior to the [instant] offense." 

 After adopting the State's proposed findings of fact, the trial court found that
appellant "failed to meet the burden of proof requirements under Article 64.03(a)(2)" (6)
and entered an order denying appellant's motion for DNA testing. 

Standard of Review

 We review a convicting court's denial of post-conviction DNA testing under
a bifurcated standard of review. Rivera v. State, 89 S.W.3d 55, 59 (Tex. Crim. App.
2002) (citing Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We
afford almost total deference to the convicting court's determination of issues of
historical fact and application-of-law-to-fact issues that turn on credibility and
demeanor, while we review de novo other application-of-law-to-fact issues. Id. The
ultimate question of whether a reasonable probability exists that appellant would not
have been prosecuted or convicted if exculpatory results had been obtained through
DNA testing is an application-of-law-to-fact question that does not turn on credibility
and demeanor and is therefore reviewed de novo. Id.; see also Smith v. State, 165
S.W.3d 361, 363 (Tex. Crim. App. 2005).

Article 63.03(a)(2)(A)

 To grant a motion for post-conviction DNA testing, a convicting court must
determine whether (1) evidence, which has been subjected to a significant chain of
custody to establish its integrity, exists in a condition making DNA testing possible;
(2) identity was or is an issue in the case; and (3) the defendant has established, by
a preponderance of the evidence, that he would not have been convicted if
exculpatory results had been obtained through DNA testing. Tex. Code Crim. Proc.
Ann. art. 64.03(a) (Vernon 2006); see also Wilson v. State, 185 S.W.3d 481, 484
(Tex. Crim. App. 2006). The issue before us is whether appellant established by a
preponderance of the evidence that he "would not have been convicted if exculpatory
results had been obtained through DNA testing." Tex. Code Crim. Proc. Ann. art.
64.03(a)(2)(A).

 The State argues that because it was established at the bench conference at trial
and by the affidavit of the trial prosecutor that the complainant "had sex two days
before the attack, any DNA test results showing the presence of a male DNA other
than appellant's would not raise a reasonable probability that appellant would not
have been convicted."

 Appellant argues that because "[t]here was no evidence presented at trial or at
the DNA motion hearing that the complainant had sexual relations two days prior to
the alleged assault, . . . any 'biological matter found in the physical evidence' could
only have come from the assailant." (7) He asserts that because, "[a]ccording to the
complainant, her assailant ejaculated inside her vagina" (8) and that "after her assailant
had finished, he told her to clean herself up with a bandana and coke, absent evidence
to the contrary, this establishes that a condom was not used during the assault," and
"therefore, any semen found would be that of the assailant." In support of his
argument, appellant relies on Smith v. State, 165 S.W.3d 361 (Tex. Crim. App. 2005).

 In Smith, the Texas Court of Criminal Appeals concluded that the trial court
had enough evidence to determine by a preponderance of the evidence that favorable
DNA results would have prevented Smith's conviction. Id. at 365. The State used
the presence of seminal fluid, obtained during an examination conducted about eight
hours after the attack, to indicate that a sexual assault had occurred. Id. at 364. The
seminal fluid obviously did not belong to the female complainant, and she did not
testify that she had intercourse with anyone other than the attacker who could have
left the seminal fluid. Id. at 365. Nevertheless, the State argued on appeal that
because the complainant lived with her boyfriend at the time of the sexual assault, it
was "possible that she had intercourse with him in the 24 hours preceding the attack
and that it was his seminal fluid that was found during the exam and not the
attacker's." Id. at 364 (emphasis added). The court rejected this argument because
there was in fact no evidence that she had engaged in sexual intercourse with anyone
else prior to the attack. Id. at 365. Thus, results indicating that the defendant's DNA
did not match the seminal fluid would have been exculpatory, and as such, the
defendant was entitled to DNA testing. Id.

 Here, the complainant did testify that after appellant "had finished and he
pulled out, he asked me if I had come, if I had come when he came" and that after
appellant "was done," he picked up a bandana, poured Coke over it, and told her "to
make sure [she] cleaned [herself] well." However, the State did not use the presence
of seminal fluid to indicate that a sexual assault occurred. Moreover, the trial record
reveals, as noted above, that appellant's trial counsel, outside the presence of the jury,
informed the trial court that the complainant had had "sex a day or two before" the
sexual assault. Appellant's trial counsel even conceded to the trial court that the rape
kit evidence would not "clear" appellant. Also, the State, during the post-conviction
proceeding, presented the affidavit testimony of the trial prosecutor, who stated that
the police offense report reveals that the complainant had in fact had sex with another
individual two days prior to the offense. Thus, in contrast to the situation in Smith,
the presence of DNA other than appellant's in this case would not necessarily be
exculpatory.

 We note that a preponderance of the evidence that a person would not have
been convicted does not exist if there is sufficient evidence, other than the DNA
evidence in question, to establish guilt. See Johnson v. State, 183 S.W.3d 515, 520
(Tex. App.--Houston [14th Dist.] 2006, pet. dism'd). In the present case, the State
relied on the testimony of Lucero, the complainant's aunt, and Mary Cantu, the
complainant's sister, to identify appellant as the person who Lucero met at the club,
and, thus, the man in the car with the complainant at the time of the sexual assault. 
There is no evidence in the record indicating that any DNA evidence recovered from
the complainant would have belonged only to her assailant. Accordingly, we hold
that appellant has failed to establish, by a preponderance of the evidence, that he
would not have been convicted if favorable DNA results had been obtained through
the requested testing.

 We overrule appellant's sole point of error.

Conclusion


 We affirm the order of the trial court.



 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Justice Bland, dissenting.


Publish. Tex. R. App. P. 47.2(b).
1. See Tex. Pen. Code Ann. § 22.021 (Vernon Supp. 2006).
2. Esparza v. State, No. 01-95-00182-CR, 1996 WL 404028 (Tex. App.--Houston [1st Dist.] July 18, 1996, no pet.) (not designated for publication).
3. Esparza v. State, No. 14-97-00440-CR, 1999 WL 548237 (Tex. App.--Houston [1st
Dist.] July 29, 1999, pet. ref'd) (not designated for publication).
4. See Tex. Code Crim. Proc. Ann. art. 64.03(a) (Vernon 2006).
5. The trial court appointed counsel to represent appellant. However, it appears that
appointed counsel filed no documents on appellant's behalf.
6. See Tex. Code Crim. Proc. Ann. art. 64.03(a).
7. We note that appellant argues that the trial prosecutor's affidavit "is indicative only
that a bench conference occurred" and that its contents relate to "matters outside the
record." However, appellant did not object or present this argument to the convicting
court. See Poindexter v. State, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005) (stating
that "once the trier of fact has weighed the probative value of unobjected-to hearsay
evidence in its factfinding process, an appellate court cannot deny that evidence
probative value or ignore it in its review of the sufficiency of the evidence"). 
8. Our review of the record reveals that the complainant did not specifically testify to
this at trial.