COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-096-CR

 

 

LUCKY LAMON ODOM                                                                      APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

              FROM
THE 297TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1] 

 

                                                       ------------

In six points that
all challenge either the sufficiency or admission of the evidence against him,
appellant Lucky Lamon Odom appeals his conviction for capital murder.  We affirm.








Background Facts

On the afternoon
of August 19, 1982, Tommy Stone, who at that time was a Fort Worth Police
Department crime scene investigator, was called to an elementary school located
near residential housing on West Seventh Street in Fort Worth.  When Stone arrived, he saw another officer
who directed him to Kathryn Munroe=s dead body.  The body was starting to decompose, had some
insect bites, and was unclothed except for an unbuttoned black shirt.  Munroe was a student at the Texas College of
Osteopathic Medicine (TCOM) and lived near the college on West Seventh Street
with another TCOM student, Jacqueline Tuttle, about a hundred yards from where
the body was found.

Stone began to
take photographs and notes of what he saw; for instance, Stone discovered
panties in a sandy playground area that he measured as being seventy-two feet
away from Munroe=s body.[2]  Stone stayed at the scene for about an hour
and collected evidence (including the panties) in paper sacks.

 Tarrant County Chief Medical Examiner Dr.
Nizam Peerwani, a certified pathologist who is responsible for determining the
cause of suspicious deaths, went to the crime scene and examined Munroe=s body.  At the scene and later in his laboratory, Dr.
Peerwani found and concluded, among other things, the following:

$       
Munroe
had a darkened, swollen face, which had hemorrhages that were consistent with
strangulation;








 

$       
she
had scratches on her neck that may have occurred from her attempt to release a
strangler=s grip;

 

$       
she
had hemorrhaged muscles, including a hemorrhage of the lining of the left
carotid artery that could have been caused by applying pressure to her neck;

 

$       
her
lungs were congested and her brain was swollen, and Aboth of these are part and parcel
of the picture of strangulation@;

 

$       
she
had recent scrapes along her vaginal cavity and an abrasion on her clitoris
with a Aprofuse amount of white watery
fluid in the vaginal canal@ that looked like semen discharge;

 

$       
the
large amount of white watery fluid was deposited into Munroe=s vagina Aat or near the time of her death
and had not been discharged,@ which indicated to Dr. Peerwani that Munroe had sexual
intercourse prior to her death; and

 

$       
Munroe=s body had lain in its location at
the school between eight and twenty-four hours before it was found.[3]








Dr. Peerwani collected vaginal and anal
smears and swabs from Munroe,[4]
samples from her pubic and scalp hair, a sample of her cardiac blood, and her
fingernail clippings from both hands, which showed signs consistent with her
trying to remove a perpetrator=s hands.  Dr. Peerwani did not examine Munroe=s panties.  The next day, Tommy Reed, who was also a
crime scene investigator, went to Munroe=s house; Reed
collected two partial fingerprints of poor, unusable quality from a doorknob
and did not see any evidence of forced entry or other apparent disarray.

The police
investigated Munroe=s murder for many yearsCthrough interviews
of males who may have dated Munroe and conversations with residents of the area
where the school was located, among other individualsCbut the murder
remained unsolved.  However, in 2003, the
Fort Worth Police Department began a process to take DNA from the evidence that
had been gathered in 1982 from Munroe=s body, send it
off for testing to Orchid Cellmark (a private company), and then upload the DNA
profile results that were obtained from Orchid Cellmark into a Combined DNA
Indexing System (CODIS).[5]








In 2007, CODIS
informed the department that there was a match between the unknown DNA profile
taken from Munroe=s body and a DNA sample taken from
appellant, who was living in Florida. 
The department then obtained warrants in Texas and in Florida and gained
another DNA sample from appellant through a swab from the inside of his
cheek.  The department took that swab,
along with Munroe=s fingernail cuttings, blood swatches, and
a vaginal smear, to Orchid Cellmark for further testing.  Orchard Cellmark=s testing revealed
the following:

$       
Munroe=s fingernail cuttings from her
right hand had DNA from more than one person but not enough DNA to link to any
specific individual;

 

$       
the
vaginal smears and swabs contained a male=s sperm fraction profile;[6]

$       
the
DNA profile obtained from the sperm found inside Munroe=s body matched the DNA profile
obtained from appellant in 2007, and the odds of finding that complete Aprofile in the population is one in
53.76 quadrillion@;[7]
and

 

$       
the testing of Munroe=s panties revealed
DNA from more than one individual, including an unknown male, and appellant was
excluded as a contributor to the DNA on the panties.

A Tarrant County
grand jury indicted appellant for capital murder; the indictment alleged that
appellant killed Munroe by strangling her with his hands while in the course of
committing aggravated rape.  After
appellant pled not guilty and the State presented its evidence at trial, a jury
convicted appellant. He received imprisonment for life as his punishment.  He filed a motion for new trial and notice of
this appeal.

Evidentiary Sufficiency








In his first two
points, appellant argues that the evidence is legally and factually
insufficient to support his capital murder conviction.

Standards of review

In reviewing the
legal sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the prosecution in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  








The trier of fact
is the sole judge of the weight and credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art.
38.04 (Vernon 1979); Brown v. State, 270 S.W.3d 564, 568 (Tex. Crim.
App. 2008), cert. denied, 129 S. Ct. 2075 (2009).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine whether
the necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict.@  Hooper v. State, 214 S.W.3d 9, 16B17 (Tex. Crim.
App. 2007).  We must presume that the
factfinder resolved any conflicting inferences in favor of the prosecution and
defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778. The
standard of review is the same for direct and circumstantial evidence cases;
circumstantial evidence is as probative as direct evidence in establishing the
guilt of an actor.  Clayton, 235
S.W.3d at 778; Hooper, 214 S.W.3d at 13.

When reviewing the
factual sufficiency of the evidence to support a conviction, we view all the
evidence in a neutral light, favoring neither party. Steadman v. State,
280 S.W.3d 242, 246 (Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d
404, 414 (Tex. Crim. App. 2006).  We then
ask whether the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the factfinder=s determination is
clearly wrong and manifestly unjust or whether conflicting evidence so greatly
outweighs the evidence supporting the conviction that the factfinder=s determination is
manifestly unjust.  Steadman, 280
S.W.3d at 246; Watson, 204 S.W.3d at 414B15, 417.  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, although legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.  








Unless we conclude
that it is necessary to correct manifest injustice, we must give due deference
to the factfinder=s determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000); see Steadman, 280 S.W.3d at 246.  Evidence is always factually sufficient when
it preponderates in favor of the conviction. 
Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d at
417.

Applicable law and analysis

To review
appellant=s evidentiary sufficiency points, we will
apply the penal statutes that were in effect in 1982 (the time of Munroe=s murder).
See Villarreal v. State, 286 S.W.3d 321, 323 n.1 (Tex. Crim. App.), cert.
denied, 130 S. Ct. 515 (2009); Ex parte Richardson, 70 S.W.3d 865,
867 n.4 (Tex. Crim. App. 2002); see also Ex parte Cole, 43 S.W.3d 713,
715 (Tex. App.CFort Worth 2001, no pet.) (explaining that
if a law became effective after a defendant committed an offense and altered
the evidence required to convict the defendant, the law would be an
unconstitutional ex post facto law).  In 1982, a person committed capital murder when
the person committed murder while in the course of committing aggravated
rape.  See Act of May 28, 1973,
63rd Leg., R.S., ch. 426, art. 2, ' 1, 1973 Tex. Gen.
Laws 1122, 1123 (amended 1983) (current version at Tex. Penal Code Ann. ' 19.03 (Vernon
Supp. 2009)).  Murder could be committed
by intentionally or knowingly causing an individual=s death or by
intending to cause serious bodily injury and committing an act clearly
dangerous to human life that caused the individual=s death.  Id. (murder statute amended 1993)
(current version at Tex. Penal Code Ann. ' 19.02 (Vernon
2003)).








In 1982,
aggravated rape occurred when a person committed rape while causing serious
bodily injury or while attempting to cause death.  See Act of May 12, 1981, 67th Leg.,
R.S., ch. 202, ' 1, sec. 21.03(a)(1), 1981 Tex. Gen. Laws
471, 471, repealed by Act of May 29, 1983, 68th Leg., R.S., ch. 977, ' 12, 1983 Tex.
Gen. Laws 5311, 5321.  Rape occurred when
someone had sexual intercourse with a female who was not his wife without the
female=s consent.  See Act of May 24, 1973, 63rd Leg., R.S.,
ch. 399, ' 1, sec. 21.02, 1973 Tex. Gen. Laws 883,
916, repealed by Act of May 29, 1983, 68th Leg., R.S., ch. 977, ' 12, 1983 Tex.
Gen. Laws 5311, 5321.[8]

The trial court=s jury charge
substantially tracked the language of these statutes.  Thus, the charge asked the jury to determine
whether appellant intentionally strangled Munroe to death with his hands while
in the course of committing or attempting to commit aggravated rape (in other
words, whether he strangled her to death while having or attempting to have
nonconsensual sexual intercourse with her and while either causing or
attempting to cause death or serious bodily injury).  See Act of May 12, 1981, 67th Leg.,
R.S., ch. 202, ' 1, sec. 21.03(a)(1), 1981 Tex. Gen. Laws
471, 471 (repealed 1983).

The evidence
presented at trial demonstrates the following:

$       
Munroe
was not married;








 

$       
Munroe
was manually strangled to death despite her attempt to get away from her
attacker;

 

$       
a
violent, nonconsensual sexual encounter occurred contemporaneously with the
strangling because Munroe=s body was found almost completely
unclothed, she had recent injuries to her vagina, and she had a Aprofuse amountA of white watery fluid in her
vagina that, according to Dr. Peerwani=s conclusion, had not been discharged and had therefore
been deposited at or near the time of her death;[9]

 

$       
appellant=s sperm was found inside of Munroe=s deceased body, and that finding
is significant because Dr. Peerwani indicated that if Munroe had moved around after
having sexual intercourse, semen would have discharged outside of her vaginal
area; and

 

$       
although
he lived in Florida in 2007, in either 1981 or 1982, appellant lived with his
then-wife, Beatrice Birdtrial, on Wingate Street in Fort Worth, only a mile and
a half to two miles away from West Seventh Street (where the school was
located), and he had access to transportation at that time.

 








We conclude that when viewed in the light
most favorable to the prosecution, this evidence (including the reasonable
inferences that may be drawn from the evidence) could allow a rational jury to
conclude beyond a reasonable doubt that appellant intentionally killed Munroe
while committing aggravated rape against her. 
Thus, we hold that the evidence is legally sufficient to support his
capital murder conviction.  See
Hinojosa v. State, 4 S.W.3d 240, 245 (Tex. Crim. App. 1999) (ADespite one in
19,900,000 odds, appellant=s DNA profile
matched the semen found in the victim. . . . [T]hese impressive statistics
support the jury=s conclusion that appellant . . . sexually
assaulted, kidnapped, and killed [the victim].@); Prince v.
State, 192 S.W.3d 49, 53, 59B60 (Tex. App.CHouston [14th
Dist.] 2006, pet. ref=d) (concluding that the evidence was
sufficient to support the appellant=s capital murder
conviction because, among other facts, DNA from blood samples collected at the
crime scene matched the appellant=s DNA); King v.
State, 91 S.W.3d 375, 379B81 (Tex. App.CTexarkana 2002,
pet. ref=d); see also
Neighbors v. State, No. 02‑07‑00176‑CR, 2008 WL 2404437,
at *3B4 (Tex. App.CFort Worth June
12, 2008, pet. ref=d) (mem. op., not designated for
publication) (holding that DNA evidence collected by police after a robbery
that matched an individual through CODIS provided legally and factually
sufficient evidence of the appellant=s identity as the
robber).  We overrule apppellant=s first point.

Similarly, viewing
the evidence in a neutral light, we conclude that it is not so weak that the
jury=s determination is
clearly wrong and manifestly unjust and that conflicting evidence does not so
greatly outweigh the evidence supporting the conviction that the jury=s determination is
manifestly unjust. See Steadman, 280 S.W.3d at 246.  As to evidence that might possibly conflict
with the jury=s guilty verdict, the record shows that
some of the items collected by the police on the day that Munroe=s body was
discovered may have been lost by the Fort Worth Police Department.  However, these lost items had been examined
in the department=s crime lab and had been determined to
have no evidentiary value.








Next, Munroe=s panties contain
a male=s DNA that does
not match appellant=s DNA. 
But the jury could have reasonably found that the unknown male=s DNA connects to
a sexual encounter unrelated to Munroe=s murder because
the evidence does not establish that any male=s DNA other than
appellant=s DNA was found inside of Munroe=s body and the
panties were found a significant distance away from Munroe=s body, which
indicates that her rape occurred away from the panties.  Alternatively, the jury might have surmised
that someone else assisted appellant in raping and murdering Munroe, which
would not affect appellant=s guilt.  See Wilson v. State, 185 S.W.3d 481, 485
(Tex. Crim. App. 2006) (AEven if there was another person who aided
appellant and has successfully evaded prosecution after all these years, it
would have no effect whatsoever on appellant=s conviction and
sentence.@). 

Finally, appellant
attempts to cast doubt on the jury=s verdict because
he notes that Dr. Tuttle (Munroe=s roommate at the
time of the murder) testified that within a couple of months after the murder,
a male whose voice she did not recognize called her unlisted telephone number
and told her that she Abetter behave or [she] would be next.@  At trial, appellant=s counsel argued
that this testimony shows that Munroe=s killer knew
Munroe and Dr. Tuttle.  Dr. Tuttle
testified that she did not know appellant.








However, the
record does not preclude the possibility that appellant knew Munroe and Dr.
Tuttle (either before or after the murder occurred)Ceven though Dr.
Tuttle did not know himCand that he somehow obtained Dr. Tuttle=s telephone number
and made the call.  The record also does
not establish that the male who made the call is necessarily the same person
who committed Munroe=s murder. 
Thus, the jury could have reasonably concluded that Dr. Tuttle=s testimony about
the phone call does not outweigh the remaining evidenceCincluding the DNA
evidenceCthat links
appellant to Munroe=s rape and murder.

For these reasons,
we conclude that under the relevant standards, the evidence is not too weak to
support the jury=s verdict and the evidence that may
conflict with the verdict is not strong enough to outweigh it. See Steadman,
280 S.W.3d at 246; Watson, 204 S.W.3d at 414B15, 417. Thus, we
hold that the evidence is factually sufficient and overrule appellant=s second point.

Rule 403 Objections








In his third
through sixth points, appellant contends that the trial court abused its
discretion by admitting several items of evidence over his rule 403
objections.  Rule 403 of the rules of
evidence provides, AAlthough relevant, evidence may be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative evidence.@  Tex. R. Evid. 403.  AProbative value@ refers to how
strongly evidence serves to make more or less probable the existence of a fact
of consequence to the litigation coupled with the proponent=s need for that
item of evidence.  Gigliobianco v.
State, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).  AUnfair prejudice@ refers to a
tendency to suggest a decision on an improper basis, commonly, though not
necessarily, an emotional one.  Id.

When a rule 403
objection is made and overruled at trial, we review a trial court=s decision to
admit evidence under an abuse of discretion standard.  Reese v.
State, 33 S.W.3d 238, 240B41 (Tex. Crim.
App. 2000). In doing so, we may consider the following factors, among
others:  (1) the probative value of the
evidence, (2) the potential of the evidence to impress the jury in some
irrational, but nevertheless indelible way, (3) the time the proponent needs to
develop the evidence, and (4) the proponent=s need for the
evidence.  Id. at 240B41.








The rules of
evidence favor the admission of relevant evidence and carry a presumption that
relevant evidence is more probative than prejudicial. Jones v. State,
944 S.W.2d 642, 652 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 832
(1997).  When determining whether
evidence is admissible under rule 403, we do not consider whether the evidence
is more prejudicial than probative; instead, we consider whether the probative
value is substantially outweighed by the danger of unfair prejudice.  Garcia v. State, 201 S.W.3d 695, 704
(Tex. Crim. App. 2006), cert. denied, 549 U.S. 1224 (2007).   Our highest criminal court has observed that
we should rarely reverse a trial court=s judgment under
rule 403.  Mozon v. State, 991
S.W.2d 841, 847 (Tex. Crim. App. 1999). 
As long as the trial court=s ruling is within
the zone of reasonable disagreement and is correct under any theory of law
applicable to the case, it must be upheld.  Winegarner v. State, 235 S.W.3d 787, 790
(Tex. Crim. App. 2007).

Crime scene and autopsy photographs

In points three
and four, appellant complains about the trial court=s admission of two
crime scene photographs of Munroe=s body and two
autopsy photographs of her face.  He
succinctly asserts that these photographs Adid no more than
to inflame the jury in sympathy for the State.@

In reviewing the
admissibility of photographs taken from a murder scene, the court of criminal
appeals recently stated,

A
court may consider many factors in determining whether the probative value of
photographs is substantially outweighed by the danger of unfair prejudice.  These factors include:  the number of exhibits offered, their
gruesomeness, their detail, their size, whether they are in color or black‑and‑white,
whether they are close‑up, whether the body depicted is clothed or naked,
the availability of other means of proof, and other circumstances unique to the
individual case.  The admissibility of
photographs over an objection is within the sound discretion of the trial
judge. 

 

Williams v. State, 301 S.W.3d 675,
690 (Tex. Crim. App. 2009) (citations omitted). 
Because the photographs in Williams Ahad probative
value in that they depicted both the crime scene and the victim=s injuries@ and because they Aportrayed no more
than the gruesomeness of the injuries inflicted@ by Williams, the
court of criminal appeals held that the trial court did not abuse its
discretion by admitting the photographs. 
Id. at 692 (citing Narvaiz v. State, 840 S.W.2d 415, 429B30 (Tex. Crim.
App. 1992), cert. denied, 507 U.S. 975 (1993)).








Similarly, in
another case styled Williams v. State, the court of criminal appeals
discussed the same factors as those quoted above and affirmed the trial court=s decision to
admit photographs under the following reasoning:

The two photographs about which appellant complains are
each approximately eight by ten inches in size. 
One shows the clothed upper half of the victim=s body in the position she was
found and the other shows the victim after she was rolled over onto a what
appears to be a bodybag by investigators at the scene. The first photograph
depicts the body and the surrounding area as they were originally seen by
investigators.  Some of the injuries
inflicted upon the victim can be seen from this angle.  The second photograph better shows the
different injuries and the extent of the damage inflicted upon the victim.  Both photographs are somewhat gruesome,
primarily due to the amount of blood depicted. However, they are no more
gruesome than the facts of the offense itself.

While the appearance of a bodybag in the second photograph
might be somewhat prejudicial, any prejudice caused does not substantially
outweigh the probative value of the photograph. Further, because these photos
are few in number, depict the wounds inflicted upon the victim, the relative
location and position in which she was discovered, and were the subject of
testimony at trial, their probative value is not substantially outweighed by
their possible prejudicial effect.

 

958 S.W.2d 186, 196 (Tex. Crim. App. 1997)
(citations and footnote omitted); see Shuffield v. State, 189 S.W.3d
782, 788 (Tex. Crim. App.) (holding similarly), cert. denied, 549 U.S.
1056 (2006); Orr v. State, 306 S.W.3d 380, 402 (Tex. App.CFort Worth 2010,
no pet.) (affirming the trial court=s decision to
admit four moderately-sized photographs because they were probative of the
decedent=s injuries and
were Ano more gruesome
than would be expected@).








The four
photographs that appellant complains about in points three and four appear in
the record in black and white and fill a letter-sized sheet of paper. The State
did not need a significant amount of time to develop the evidence relating to
any of the photographs.

Appellant
challenges the admission of State=s exhibits four
and five in his third point.  State=s exhibit four
shows Munroe=s mostly unclothed body (with part of one
breast visible), which was lying in the grass, from a medium-distance side
angle with Munroe facing the opposite direction from which the picture was
taken.  It does not expressly depict her
injuries, and it does not show her pubic area. 
State=s exhibit five shows Munroe=s almost naked
body (including her breasts and pubic area) from a medium-distance aerial-type
view and depicts some of her injuries, although her face in the photograph is
dark and difficult to see.








These exhibits
provide context to Stone=s description of the crime scene, and they
therefore have probative value.  See
Williams, 301 S.W.3d at 692; Frank v. State, 183 S.W.3d 63, 78 (Tex.
App.CFort Worth 2005,
pet. ref=d) (explaining
that crime scene photographs Awere helpful to
the jury because they provided a visual context for [two detectives=] testimony@); see also
Jones, 944 S.W.2d at 652 (AWe have
consistently held that photographs are generally admissible where verbal
testimony about the same matters is admissible.@). While the
exhibits show Munroe=s unclothed body, they are not excessively
bloody, they are no more gruesome than the crime itself, and they depict a true
representation of the discovery that the officers made in 1982, which supports
the State=s theory of the rape.  Thus, the trial court could have reasonably
determined that neither of State=s exhibits four or
five is inflammatory enough to create unfair prejudice that substantially
outweighs probative value.  

Therefore, we hold
that the trial court did not abuse its discretion by overruling appellant=s rule 403
objection to State=s exhibits four and five. See Reese,
33 S.W.3d at 240B41. 
We overrule his third point.

In his fourth
point, appellant complains about the trial court=s decision to
admit State=s exhibits nine and ten, which are
photographs from Munroe=s autopsy. 
AAutopsy photographs
are generally admissible unless they depict mutilation of the victim caused by
the autopsy itself.@  Williams,
301 S.W.3d at 690 (citing Santellan v. State, 939 S.W.2d 155, 172 (Tex.
Crim. App. 1997)).  State=s exhibit nine
shows a close-up image of Munroe=s darkened face
with hemorrhages and fluid running from her nose and mouth.  The photograph in State=s exhibit ten is
similar to exhibit nine but was taken from a slightly different angle.  Neither photograph shows mutilation caused by
the autopsy.








According to Dr.
Peerwani, the photographs show Aa lot of fluid
purging from the nose and mouth.  These
are all agonal fluids that purge because of pressures that are applied to the
body, in this case in the neck area.@  The photographs also show blood vessels that
snapped because of the pressure to Munroe=s jugular
veins.  Thus, the photographs are
probative of the cause of Munroe=s deathCstrangulationCthat was specified
in the State=s indictment. See Saldano v. State,
232 S.W.3d 77, 101B02 (Tex. Crim. App. 2007) (holding that
autopsy photographs were admissible to help illustrate a medical examiner=s testimony), cert.
denied, 552 U.S. 1232 (2008); King v. State, 189 S.W.3d 347, 356
(Tex. App.CFort Worth 2006, no pet.) (holding that an
autopsy photograph had probative value because it Adirectly relate[d]
to the medical examiner=s testimony that asphyxiation was a
possible cause of death, and it d[id] not depict any mutilation resulting from
the autopsy@). 
Finally, although the photographs are somewhat gruesome, they are no
more gruesome than the reality of Munroe=s murder.  See Narvaiz, 840 S.W.2d at 429B30.

For these reasons,
we hold that the trial court did not abuse its discretion by admitting State=s exhibits nine
and ten.  See Reese, 33 S.W.3d at
240B41. We overrule
appellant=s fourth point. 

DNA items








 In his fifth and sixth points, appellant
argues that the trial court erred by admitting a buccal swab kit that contained
DNA taken from the inside of appellant=s cheek and other
various items related to DNA testing.  Appellant
does not explain how this evidence violated rule 403; instead, he states only, AIt was highly
prejudicial to admit [the various items of evidence] because the Court did not
conduct a balancing test as is required by Rule 403.@  However, we presume that the trial court
conducted a balancing test.  Williams,
958 S.W.2d at 195B96; see Rojas v. State, 986 S.W.2d
241, 250 (Tex. Crim. App. 1998); Moyer v. State, 948 S.W.2d 525, 531
(Tex. App.CFort Worth 1997, pet. ref=d) (AThe trial court
was not required to announce for the record that it has completed the balancing
test in its own mind, but we may imply from the record that a proper balancing
test was done.@).

Because appellant
asserts in his fifth and sixth points only that the trial court did not conduct
a balancing test and because we presume that the court conducted one, we
overrule those points.[10]








Conclusion

Having overruled
all of appellant=s points, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  June 10, 2010











[1]See Tex. R. App. P. 47.4.





[2]Another officer reported that the
panties were twenty-five feet north of the body.  Later DNA testing confirmed that Munroe had
worn the panties.





[3]Dr. Peerwani testified at trial, ASo all and all, all of this was
consistent with a strangulation. . . . 
And so the most consistent findings were associated with a manual
strangulation.@ 
Dr. Peerwani defined manual strangulation as one caused by a strangler=s bare hands, and he gave a
detailed explanation about how death occurs when someone is strangled,
including his opinion that Aone has to apply consistent pressure for three to five
minutes before a person really will suffer a brain death.@





[4]Dr. Peerwani testified, AThe vaginal smear is collected by
inserting a sterile Q-tip into the vaginal canal . . . .  And then the swab is then smeared on a dry
glass slide in a circular motion.  And
then the glass slide is air-dried.@





[5]The department originally sent a
blood swatch, a cutting from Munroe=s panties that had semen on it, and a vaginal swab to
Orchid Cellmark.  Orchid Cellmark uses
polymerase chain reaction (PCR) testing to create an individual=s DNA profile.  Orchid Cellmark did not test many of the
items discovered around Munroe=s body in 1982, including her black shirt.  Appellant has not contended on appeal that
there are any particular deficiencies in Orchid Cellmark=s general testing procedures or in
the specific results that the company obtained related to this case.





[6]Appellant theorized at trial that
more than one male=s DNA profile could have been found
from Munroe=s vaginal swabs and smears, but the
testimony from Orchid Cellmark=s representative, Matthew Quartaro, does not support this
theory.  Quartaro specifically testified
that he found Aa sperm cell fraction which was
consistent with Lucky Odom,@ not that he found more than one sperm cell fraction.





[7]The department excluded three
specific individuals from being contributors to the biological samples that
were found in Munroe=s body.





[8]Instead of rape and aggravated
rape, the penal code now has offenses for sexual assault and aggravated sexual
assault.  See Tex. Penal Code Ann.
'' 22.011, 22.021 (Vernon Supp.
2009).





[9]During his testimony, Dr. Peerwani
specifically affirmed that the injuries to Munroe=s vagina and the other injuries
that he discovered occurred contemporaneously with her death.





[10]We are not required to make other
rule 403 arguments on appellant=s behalf.  See
Santellan, 939 S.W.2d at 173.