

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,084

**JUAN RAUL NAVARRO RAMIREZ, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM DENIAL OF MOTION FOR FORENSIC DNA TESTING IN CAUSE NO. CR-0551-04-G FROM THE 370ᵀᴴ JUDICIAL DISTRICT COURT HIDALGO COUNTY**

**RICHARDSON, J.,** *delivered the opinion of the Court.*

## O P I N I O N

Appellant appeals from a trial court order denying his motion for post-conviction

DNA testing filed pursuant to Texas Code of Criminal Procedure Chapter 64.[1]  Appellant

---

[1] References to Chapters or Articles in this opinion are to the Texas Code of Criminal

(continued...)

raises the following two issues for review:

> 1. Whether the Trial Court Erred in Denying [Appellant's] Motion for Post-Conviction DNA Testing.
>
> 2. Whether [Appellant] is Entitled to Post-Conviction DNA Testing.

After reviewing the record, we find that Appellant's points of error lack merit.

Consequently, we affirm the trial court's order denying testing.

I.      BACKGROUND

*A.      Offense Facts*

Appellant was convicted and sentenced to death in 2004 for intentionally and knowingly causing the deaths of Jimmy Almendarez, Juan Delgado III, Jerry Hildalgo, Juan Delgado Jr., Ruben Castillo, and Ray Hidalgo by shooting them with a firearm during the same criminal transaction.[2]  In our opinion on Appellant's direct appeal challenging his conviction and sentence, we summarized the offense facts as follows:

> This trial involved the gang-related, "pseudo-cop" robbery-homicide of six men, some of whom were rival gang members of the "Bombita" gang to which appellant belonged.
>
> In the early morning hours of January 5, 2003, police responded to a

---

[1](...continued)
Procedure unless otherwise specified.

[2] Appellant was separately convicted and sentenced to death for a second count of capital murder for intentionally and knowingly causing the deaths of these same individuals in the course of robbing or attempting to rob them as a member of a criminal street gang.  On direct appeal, we vacated Appellant's conviction for this second count of capital murder on double jeopardy grounds.  *Ramirez v. State*, No. AP-75,167, slip op. at 10–12 (Tex. Crim. App. Dec. 12, 2007) (not designated for publication).

9-1-1 call and found the bodies of six men at 2915 East Monte Cristo Road in Edinburg.  There were two houses on the property that were separated by a dirt driveway.  Police found the body of Jerry Hidalgo in the kitchen of the larger house that was located on the west side of the driveway (the "west-side house").[3]  He was lying face down on the floor and his hands and legs were bound with extension cords.  He had sustained numerous gunshot wounds, and there was a bullet hole in his back and blood around his head.  The living room had been ransacked, and it appeared that someone had rummaged through one of the bedrooms, leaving the bed mattress standing on its side.

The body of Juan Delgado, III, was lying face down in the grass outside the front door of the smaller house on the east side of the driveway (the "east-side house").  He had suffered a fatal gunshot wound to the back of his neck.  There was a live 9-millimeter round in the grass near his body.  As they entered the house, police discovered the bodies of Juan Delgado, Jr., who had been shot in the back and head, and Jimmy Almendarez, who had suffered multiple gunshot wounds, including a fatal head wound.  Police also found a magazine clip underneath a stereo speaker.  The bodies of Ray Hidalgo and Ruben Castillo were in another room.  Ray had sustained two gunshot wounds to the head and was missing an eye.  Ruben had suffered multiple gunshot wounds including shots to the buttocks.  Police also found a burnt marijuana cigarette and small baggies of marijuana and cocaine in that room.  The "east-side house" had also been ransacked, and the victims' pockets had been pulled out.

Some of the ballistics evidence recovered from the scene included 7.62 by 39 caliber bullets and casings.[4]  Police also recovered a cooking pan and some black skull caps from the west-side house and a "cold weather knit cap" from the open field behind the houses.  There were three cars parked at the scene:  an inoperable dark-colored Dodge Ram that belonged to Rosie Gutierrez; a small maroon car that had been rented by Jimmy Almendarez; and a brown Buick Regal that belonged to Luis Villa.

Rosie Gutierrez was present during the shootings and called 9-1-1

---

[3] The "west-side house" had a kitchen, living room, two bedrooms, and a utility room. There was a storage shed behind it.  An outhouse was located behind the "east-side house."

[4] This is the type of bullet[] used in an AK-47.

after the assailants left the scene.  She testified that she and her sons, Jerry and Ray Hidalgo, lived at 2915 East Monte Cristo Road, and that the Delgados, Almendarez, and Castillo were her sons' friends.  On the night of January 4, she played dominoes with her sons in the west-side house.  Ray went to the east-side house with Delgado, Jr., at around midnight.  Shortly thereafter, she and Jerry finished playing dominoes and went into the living room.  Ms. Gutierrez suffered from a medical condition that affected her legs, so she laid down in a borrowed hospital bed she kept in the living room to watch television while Jerry talked on the phone with a friend.  She heard loud booming noises that sounded like fireworks; then someone banged on her door, and three or four men entered her house.  The leader, a man who spoke Spanish and who had a long gun with holes in the barrel, pointed the gun at her head and told her to lie down and face the wall.  He was wearing a ski mask and a jacket with the word "Police" on the sleeves and back.  He ordered his cohorts to tie up Ms. Gutierrez and Jerry, and they used extension cords to do so.  The man who tied up Ms. Gutierrez was unmasked and carried a smaller handgun.  The other men who restrained Jerry were masked, and she was unsure if they had guns.  The leader demanded "drugs, money, gold and guns" and kept hitting Jerry in the head with his gun.  Jerry responded that they did not have anything.  "They" told Jerry to take off his gold necklace and asked for the car keys.  Jerry answered that the car was "no good" and that they would get caught if they left in it.  "The guy" pulled off Jerry's tennis shoes and asked if anyone wanted them.  He then dropped the tennis shoes, stating, "Let's go," and they left.

Shortly thereafter, "a man with a ski mask" carrying a long gun and wearing a jacket with "Police" on it came back into the house and ransacked the living room.  He left, came back inside, shot Jerry "a whole bunch of times," then left again.  Ms. Gutierrez then untied herself and called 9-1-1.

Police later questioned Luis Villa, who was also present at the scene on the night of the shootings.  Villa told police that he and Castillo took Delgado, Jr. to "Ray's house" at 9:30 p.m.  Villa and Castillo then tried to go to a nightclub.  Villa was denied entrance to the club because he did not have proper identification, so they returned to Ray's house at about 10:30 p.m.  Delgado, III, came to the house with a friend about 12:30 a.m.  Castillo went outside to use the bathroom, and Villa heard a voice tell Castillo:  "Hey you mother fucker get your ass on the floor . . ."  Delgado,

Jr., said there were a lot of people with guns outside. Villa, who was seated on a sofa, heard some gunshots and jumped out the window. He told Delgado, Jr., to follow him, but he did not do so. As Villa ran away, he heard "two kinds of machine guns shooting at the same time."

Villa's friend Jose Carreon testified that he called Villa on his cell phone around 1:00 or 1:30 a.m. Villa, who was "scared, tired, [and] running," said that "they were shooting at him, and they shot his cousins."[5] Carreon heard gunshots in the background. Carreon also lived near the scene and heard gunshots outside.

Police received information about a "pseudo-cop" robbery and took various suspects into custody. Police also discovered that suspect Rodolfo Medrano (a/k/a "Kreeper") had given his friend Miguel Tinajero some weapons to hide. Tinajero testified that on January 20, Medrano gave him a long case and said, "Take this and put it away." Tinajero later opened the case and saw three military-style rifles inside. Tinajero placed the weapons inside the trunk of a car at his father's residence in Elsa. When he opened the trunk, he saw that other weapons had already been placed inside. He testified that Medrano had been to his father's residence before and knew where the car keys were kept. Tinajero notified police about the guns. Two of the guns, State's Exhibits 107 and 113, had apparent bloodstains and were submitted for DNA testing. The stain on the stock area of State's Exhibit 107 was inconclusive. The stain on the muzzle of State's Exhibit 113 was consistent with the DNA profile of victim Delgado, Jr.

Appellant was eventually arrested and gave an audiotaped statement to police. In his statement, he admitted that he "used to hang around with" some "TCB"[6] gang members. He said that at 7:00 or 8:00 p.m. on January 4, Robert Garza (a/k/a "Bones") called and asked him if he wanted to make some money. "Bones" told him it was about "some jelly beans," which means "some pounds." Bones told him an amount, which appellant thought was "a thousand pounds or a little bit more of something." He agreed to participate and met Bones at the home of a person who went by

---

[5] Delgado, Jr., and Delgado, III, were step-brothers. Villa testified at trial that Delgado, Jr., was his cousin.

[6] When booked, Appellant said he was connected to the "Bombita" gang. This gang was formerly part of the "Tri-City Bombers" or "the TCBs." *See infra* [at 7].

the name Juanon (a/k/a "Barney"). Some of the other people present included Salvador Solis, Freddy Krueger, and Marcial Bocanegra. Most of them were wearing black, some wore ski masks, and all of them wore gloves. Appellant stated that "it was supposed to be a pseudo-cop" type of robbery, and they "were supposed to go in there to look for drugs and weapons."

Appellant stated that when he arrived at Juanon's, the guns and bullets had already been cleaned of fingerprints. Appellant, the last one to choose his weapon, selected a "cuerno de chivo."[7] Appellant said the men drove to the scene in a black or dark blue truck and a light brown Escalade, and the "one with the Escalade" was "the one who was telling us what was going down." The "one with the Escalade" said: "They got guns and there might be some people in there, too, so you gotta put them down 'cause the family members got some guns."

Appellant stated that they hid in the tall grass in a field behind the houses with their high-caliber weapons. When a man stepped outside to use the bathroom, they got up, "started rushing the houses," and "rushed him in." Appellant, Salvador, and another man went into one house where "there was only a lady and a guy."[8] Appellant stated: "We heard . . . some gunshots in the other house, but we didn't know what was it about, so we didn't think nothing bad was happening." Appellant stated that they put the male victim down on the floor at gunpoint and that he ordered one of the men to tie up the female victim, who was in bed. Appellant checked the house for other people, drugs, or weapons but did not find anyone or anything. Appellant then "tied down the guy with an orange extension cord" and "started demanding the drugs." The male victim responded that he had nothing and that all of the drugs were in the other house, so appellant "started beating him up" and "hit him with a pan a couple of times." Appellant also took a gold chain from his neck, which he later threw away.

Appellant said that Salvador kept an eye on the door and that

---

[7] Officer Ramiro Ruiz testified that the literal Spanish to English translation of "cuerno de chivo" is "the horn of a goat or a ram, how it curves," but that he has heard the term used to describe "the AK-47 or 7.62 by 39 caliber rifle."

[8] This was the "west-side house" in which the body of Jerry Hidalgo was found.

appellant and "the other guy" held the male victim at gunpoint. After a while, appellant heard gunshots at the other house. He went outside and saw the others running out of the house, saying, "Let's go. Let's go." He asked one of them "where was everything at" and was told "that nothing was there, and that we gotta leave." Appellant heard more gunshots as he and his two cohorts were running away. They ran across the field, got into the truck, and left. Everyone met back at Juanon's, where appellant heard Bones say, "I shot the mother fuckers."[9]

Investigator David Valdez testified that four high-caliber bullet projectiles, State's Exhibits 229, 230, 231, and 232, were recovered from Jerry Hidalgo's body during his autopsy. Forensic firearms and toolmarks examiner Tim Counce testified that these exhibits "were .30 caliber class' and offered "a more discriminating opinion to include a 7.62 by 39 millimeter cartridge."

When appellant was booked into the county jail, he told detention officer Robert Mendiola that he was affiliated with the "Bombita" gang. Investigator Robert Alvarez with the Edinburg Police Department testified that the "Tri-City Bombers" gang used to call themselves "the TCBs," but now call themselves "the Bombitas." Alvarez testified that some TCB members formed a rival gang, the Texas Chicano Brotherhood, or "the Chicanos." Alvarez further testified that the "Bombitas" and "Chicanos" have "a green light against each other," meaning they could fight or kill each other "without asking permission from the [gang] command structure." Alvarez testified that appellant associated with TCB members and had a tattoo that was indicative of TCB membership. Rosie Gutierrez testified that victims Jerry and Ray Hidalgo were "Chicanos."

Defense witness Marissa Martinez testified that she and a friend visited the east-side house a few days before the murders. Villa, Castillo, Delgado, Jr., and Ray Hidalgo were there. She testified that Villa showed her that they were "stashing drugs" in a room at the east-side house. The drugs were "stacked to the ceiling" and "covered with a blue tarp." She testified that there were "a lot" of drugs, estimating the amount at "[l]ike 1,000" pounds. She told her boyfriend Robert Cantu that there was a lot of marijuana at Ray Hidalgo's house and that she had met Villa there. She

---

[9] DNA testing revealed that Robert Garza a/k/a/ "Bones" could not be excluded as a contributor of DNA on a black cap found at the scene.

testified that Cantu was angry at her for going over to the house. She further testified that Villa was a member of the "Texas Syndicate" gang.

*Ramirez v. State*, No. AP-75,167, slip op. at 2–9 (Tex. Crim. App. Dec. 12, 2007) (not designated for publication) (footnotes in original). The jury charge authorized the jury to convict Appellant of capital murder as a principal or a party under Texas Penal Code § 7.02(a)(2).[10] The jury returned a general verdict finding Appellant guilty as alleged in the indictment.

### B.      Direct Appeal and Habeas Proceedings

Appellant raised twenty-seven points of error on direct appeal, including challenges to the sufficiency of the evidence to support his conviction and the voluntariness of his statements to investigators. This Court rejected these and Appellant's other points of error and affirmed his conviction and sentence. *See id.* at 2.

In his initial state habeas application filed pursuant to Article 11.071, Appellant raised nineteen allegations, including a contention that he is actually innocent of the capital offense and a renewed challenge to the voluntariness of his statements. While his initial writ application was still pending before the trial court, Appellant filed an "amended application" in the trial court containing sixteen claims. Among other allegations, Appellant asserted for the first time that his confession was not just

---

[10] "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE § 7.02(a)(2).

involuntary, but false. We denied relief on Appellant's initial writ application and dismissed his amended application as a subsequent writ application that did not meet any of the exceptions provided for in Article 11.071, § 5. *Ex parte Ramirez*, Nos. WR-71,401-01 & WR-71,401-02 (Tex. Crim. App. Oct. 14, 2015) (not designated for publication).

## II. CHAPTER 64 AND THE STANDARD OF REVIEW

"There is no free-standing due-process right to DNA testing, and the task of fashioning rules to 'harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice' belongs 'primarily to the legislature.'" *Ex parte Gutierrez*, 337 S.W.3d 883, 889 (Tex. Crim. App. 2011) (quoting *District Attorney's Office v. Osborne*, 557 U.S. 52, 62 (2009)); *see also Ex parte Mines*, 26 S.W.3d 910, 914 (Tex. Crim. App. 2000) (stating that there is no constitutional right to post-conviction DNA testing). The Texas Legislature created a process for such testing in Chapter 64.

Under Chapter 64, the convicting court must order DNA testing only if the court finds that:

1. the evidence "still exists and is in a condition making DNA testing possible";

2. the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect";

3. "there is a reasonable likelihood that the evidence contains biological

material suitable for DNA testing; and"

4.      "identity was or is an issue in the case[.]"

Art. 64.03(a)(1).  Additionally, the convicted person must establish by a preponderance of

the evidence that:

1.      he "would not have been convicted if exculpatory results had been obtained
        through DNA testing; and"

2.      "the request for the proposed DNA testing is not made to unreasonably
        delay the execution of sentence or administration of justice."

Art. 64.03(a)(2).

In reviewing a judge's ruling on a Chapter 64 motion, this Court gives almost total

deference to the judge's resolution of historical fact issues supported by the record and

application-of-law-to-fact issues turning on witness credibility and demeanor.  *Reed v.

State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017).  But we consider *de novo* all other

application-of-law-to-fact questions.  *Id*. at 768–69.

III.    APPELLANT'S CHAPTER 64 MOTION AND THE TRIAL COURT'S RULING

In October 2015, Appellant filed in the trial court his Chapter 64 motion for post-

conviction DNA testing.  In this motion, Appellant requested testing of two items:

(1)     a black ski mask with the word "Police" written on it (admitted into
        evidence at trial as State's Exhibit 211); and

(2)     a black knit cap with an "8 Ball" logo on it (admitted into evidence as
        State's Exhibit 215).

Appellant addressed the requirements for testing under Article 64.03.  He stated

that investigators recovered both hats from the "west-side house" where the trial evidence showed that Rosie Gutierrez and her son, Jerry Hidalgo, were located during the offense.[11]  Appellant asserted that both hats still existed and were in a condition making DNA testing possible.  He averred that there was a reasonable likelihood that both hats contained biological material, emphasizing that a hair was present on the inside of State's Exhibit 211 (the black ski mask with the word "police" on it).  Appellant also contended that the two exhibits had been subjected to a chain of custody sufficient to establish that they had not been tampered with and asserted that identity was an issue in the case. Appellant further asserted that his request for DNA testing was not made to unreasonably delay the execution of his sentence.  Appellant's affidavit pursuant to Article 64.01(a-1) accompanied his motion.  *See* Art. 64.01(a-1) ("The motion [for Chapter 64 DNA testing] must be accompanied by an affidavit, sworn to by the convicted person, containing statements of fact in support of the motion.").

But Appellant devoted the majority of his motion to attempting to show that he would not have been convicted if his requested DNA testing yielded exculpatory results. Appellant defined "exculpatory results" as establishing "who it was that entered [the west-side] house and left behind the two hats" at issue. We disagree with Appellant's

---

[11] The direct appeal record shows that the black ski mask with the word "Police" embroidered on it (State's Exhibit 211) was recovered from on top of a kitchen cabinet in the west-side house and that the black knit cap with the "8 Ball" logo on it was found on the living room floor.  On cross-examination, Gutierrez testified that she saw a fourth man in the kitchen wearing a mask.

definition of "exculpatory results" given the facts of this case. Appellant confessed to participating in this home invasion with multiple assailants, and almost all of the acts mentioned in Appellant's confession were corroborated by the elderly aunt of two of the victims who was also tied up and injured. It is uncontroverted that Appellant, his codefendants, and all of the victims were members of two violent street gangs that dealt in large quantities of drugs and had "green lights" to kill each other, and Appellant was convicted and sentenced to death under the law of parties. As a result, regardless of what DNA, if any, was found in the hats, it could not have provided any true exculpatory evidence. If Appellant's DNA was contained in either hat, it would have inculpated him. But if another person's DNA was discovered, those results would have been meaningless given the aunt's testimony regarding the hats and the number of assailants and dead victims who could have worn the hats.

Appellant explained that Marcial Bocanegra's statement to police upon Bocanegra's arrest "was the key break in the case" and aligned with Rosie Gutierrez's trial testimony. Appellant said that Gutierrez testified "that men came in to her home wearing clothing that said 'Police.'" Appellant asserted that Gutierrez and Bocanegra both described:

> a similar man giving orders to the others in the home, a man who Bocanegra
> knew as "Lenny" and that the police claim[ed] was Ramirez. Both
> Bocanegra and Gutierrez undoubtedly describe[d] the same person.
> Importantly, Bocanegra explained to the police that "Lenny" dropped his
> hat at the crime scene. There is a high probability that one of the two hats
> that Ramirez requests DNA testing on was in fact the hat dropped by

"Lenny," and the requested DNA testing can establish that person's identity. (Citations omitted). Appellant asserted that the State had "mistakenly conflated [appellant] with 'Lenny' at trial."

Appellant emphasized that Bocanegra signed a post-conviction affidavit in which he "unequivocally stated that [appellant] is not the 'Lenny' that [Bocanegra] described" in his statement to police. Appellant argued:

> If the currently requested DNA testing provides exculpatory results, it will provide further support that [appellant] in fact was not one of the men who entered Gutierrez's house, nor is he "Lenny." The DNA testing that [appellant] requests can identify the assailants that entered Gutierrez's house. If exculpatory results are obtained, it would show that, by a preponderance of the evidence, [appellant] would not have been convicted, whoever "Lenny" is may be identified, and the police conflation with Ramirez and "Lenny" can be disproven.

(Internal footnote omitted).

Appellant asserted that his conviction "rested nearly entirely on the recorded statement he gave to police." Appellant acknowledged that, in this statement, he said that "he went into the house where Gutierrez and her son were, that he was the one giving orders, and that he was the one who beat Gutierrez's son." But citing his subsequent habeas application, Appellant emphasized that he had since provided evidence that his confession was false. Appellant asserted that the trial court should consider the evidence that his confession was false when determining whether he would not have been convicted if exculpatory results were obtained. However, no results from testing the DNA samples in question could have invalidated Appellant's confession, given all of the facts

of this case.

After a hearing on Appellant's motion, the trial court denied it in a written order. In pertinent part, the court found that Bocanegra's affidavit, which was attached as an exhibit to Appellant's motion, was not credible.[12] Citing *Drew v. State*, 743 S.W.2d 207, 288 (Tex. Crim. App. 1987), the court noted that "testimony from an accomplice that exonerates a defendant without exposing the accomplice to further criminal liability is to be viewed with suspicion." The court also stated that Appellant had not shown that his confession was actually false. Instead, the court found, Appellant had merely presented evidence that some defendants have given false confessions. Therefore, the court stated that it would consider the confession in deciding whether to grant or deny Appellant's motion. The court further found that Gutierrez testified at trial that she did not recognize either State's Exhibit 211 or State's Exhibit 215 as the mask worn by the leader of the men who entered the west-side house and assaulted and then killed her son, Jerry Hidalgo.

> In its conclusions of law, the trial court stated in pertinent part:

> In light of the significant evidence of [appellant's] guilt, [appellant] has not shown that he would not have been convicted based upon the results of additional forensic DNA testing. Article 64.03 requires a convicted person to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing.

---

[12] In relevant part, Bocanegra stated in the affidavit that he had never met the person he knew as "Lenny" before the night of the offense. Bocanegra further stated that he met Appellant "for the first time in the Hidalgo County Jail" and that Appellant is not the "Lenny" individual that Bocanegra described to police.

TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A) (2012). Exculpatory results
that would merely "muddy the waters" are insufficient to show that the
defendant would not have been convicted. *Kutzner v. State*, 75 S.W.3d 427,
439 (Tex. Crim. App. 2002). Given the testimony at trial that neither State's
exhibit 211, nor State['s] exhibit 215 was the mask worn by [appellant],
exculpatory results on said exhibits cannot prove by a preponderance of the
evidence that [appellant] would not have been convicted. Further,
[appellant] has failed to establish that the individual he is alleged to be must
have been wearing either State's exhibit 211 or State['s] exhibit 215. Three
individuals entered the [west-side] residence and only two masks were
recovered. [Appellant] has failed to make the requisite showing to require
further DNA testing under Chapter 64 of the Code of Criminal Procedure.

IV.    APPELLANT'S ARGUMENTS ON APPEAL

In this Court, Appellant again argues that he has met all of Chapter 64's

requirements to have DNA testing conducted on State's Exhibits 211 and 215.  Appellant

re-urges his argument that he has shown by a preponderance of the evidence that he

would not have been convicted if exculpatory results had been obtained through DNA

testing of State's Exhibits 211 and 215 (i.e., the existence of a third party's DNA profile

on either exhibit).  We disagree for the aforementioned reasons and reiterate that DNA

testing on the requested exhibits could not have provided exculpatory results given the

facts of this case. Appellant notes that the State's argument at trial was that he was the

leader of the men who entered the west-side house.  Appellant says that the State asserted

that Appellant was "Lenny," the person whom Bocanegra told police:  tied up and beat

Gutierrez's son, Jerry Hildalgo; directed Bocanegra to tie up Gutierrez; asked where the

drugs and money were; and searched the west-side house.  Appellant again emphasizes

that Bocanegra stated in his post-trial affidavit that Appellant was not the man Bocanegra

knew as Lenny. Therefore, he argues that "if the requested DNA testing of the hat or ski mask do not reveal a match to [appellant], this will provide further support that [appellant] was not one of the men who entered Ms. Gutierrez's house and that he certainly isn't the man named 'Lenny.'"

As to the trial court's ruling denying him such testing, Appellant first alleges that the trial court abused its discretion in finding that Bocanegra's affidavit is not credible. Appellant argues that the trial court provided no analysis for that adverse credibility determination other than its citation to the *Drew* case. Appellant contends that *Drew* is not on point because it involved an accomplice who recanted a statement inculpating the defendant. Appellant asserts that, unlike the recantation in *Drew*, Bocanegra's affidavit is not inconsistent with his original statement to the police because Bocanegra never implicated Appellant in that statement. Appellant argues that Bocanegra's affidavit simply clarifies that the man he identified in his statement to police as "Lenny" was not Appellant.

Appellant next contends that the trial court abused its discretion by finding that his confession was not false. Citing his subsequent habeas application, Appellant argues that the trial court failed to acknowledge or address his evidence that "causes of involuntary and false confessions [were] applicable to [appellant], given his intelligence, age, and social history."

Appellant further alleges that "it was error for the trial court to consider [his]

confession at all in deciding whether to grant his request for post-conviction DNA testing." To support this assertion, Appellant notes that Article 64.03(b) prohibits a court from using the fact that a defendant confessed as the sole basis for finding that identity was not an issue in the case under Article 64.03(a)(1)(C).

V.     ANALYSIS

A.     *Article 64.03(a)(1)'s and Article 64.03(a)(2)(B)'s Requirements*

In his motion for DNA testing, Appellant asserted that the two items he sought to have tested contained biological material, were in a condition making DNA testing possible, and were subject to a sufficient chain of custody. *See* Art. 64.03(a)(1)(A) and (B). He also averred that identity was an issue in his case. *See* Art. 64.03(a)(1)(C). He further contended that he did not make the testing request to unreasonably delay the execution of his sentence or the administration of justice. *See* Art. 64.03(a)(2)(B). The State did not contest these assertions. The trial court did not make express findings that Appellant had met Article 64.03(a)(1)'s and Article 64.03(a)(2)(B)'s requirements, but even if they had been met, Appellant still could not satisfy Article 64.03(a)(2)(a) because DNA testing of these exhibits could not provide the exculpatory results that Appellant claims.

B.     *Article 64.03(a)(2)(A)'s Requirements*

Appellant advances essentially the same argument in each of his two points of error. We understand Appellant to assert that: (1) he has shown by a preponderance of

the evidence that he would not have been convicted of capital murder if DNA testing of State's Exhibits 211 and 215 yielded the presence of a third party's DNA profile; and (2) the trial court erred by concluding otherwise. However, we disagree with both contentions for the reasons discussed below.

According to the evidence presented at trial, a group of heavily armed Bombitas gang members seeking to steal drugs invaded the property where Rosie Gutierrez lived in the "west-side" house with her sons, Ray and Jerry Hidalgo. The Hidalgo brothers belonged to a rival gang, the Chicanos. Jerry Hidalgo had Chicanos tattoos on his neck and chest. The Bombitas and Chicanos had a "greenlight" or pre-authorization from their respective gang leadership to fight or kill one another. The Bombitas group embarked on the robbery attempt knowing that armed individuals would be on the premises and that these people would need to be "put down."

Ray Hidalgo and four other victims died inside or near the smaller, east-side house on the property. The remaining victim, Jerry Hidalgo, was killed inside the west-side house. Gutierrez, who was also in the west-side house during the attack but survived, testified about the events leading up to Jerry's death.

Gutierrez stated that, shortly after she heard "boom boom boom" noises nearby, she heard pounding on her front door. A man carrying a long gun with distinctive holes in the barrel came through the door and pointed the weapon at her head. This man was wearing a jacket with "Police" on the back and sleeves and a ski mask. Gutierrez

described this man as the leader who directed the actions of the two or three more men who entered the house immediately after him.  All but the second man who entered the house were wearing masks.  But when shown both State's Exhibits 211 and 215 (respectively, the black ski mask with the word "Police" on it and the black knit cap with the "8 Ball" logo on it), Gutierrez testified that they were not the masks that any of the intruders in her house had been wearing.

At the first man's direction, the second man (who was armed with a hand gun) bound Gutierrez with a telephone cord.  Also at the first man's direction, the second and third men carried Jerry from the living room sofa into the hallway, where they bound him with extension cords.  The first man beat Jerry while demanding drugs, money, and gold. After Jerry denied knowing about any drugs or money on the premises, the first man told the rest of the intruders, "Let's go."  However, the first man returned immediately after the other intruders left.  He walked deliberately through the house, upended a few pieces of furniture, and then shot Jerry to death.

The State also presented evidence that, after his arrest, Appellant gave a detailed confession admitting his involvement in the offense.  Appellant admitted that he and his cohorts were armed and that he knew that the group would likely have to kill people at the targeted property to achieve their objective.  When they arrived at the property, Appellant stated, he helped to "rush" the first man they saw into the east-side house.  While hearing gunshots in the east-side house, Appellant went to the west-side house in which there was

only "a lady and a guy." Appellant then admitted to actions that closely tracked the actions of the first intruder whom Gutierrez described in her testimony. However, Appellant denied that he personally shot anyone, that he knew anything about anyone having been shot in the west-side house, or that he personally saw anyone else being shot elsewhere on the property.

Count One of the indictment alleged that Appellant intentionally and knowingly caused the deaths of the six victims in the same transaction by shooting them with a firearm. The jury charge permitted the jury to find Appellant guilty as either a party or a principal. The jury returned a general verdict finding Appellant guilty as alleged in the indictment.

Appellant now contends that he should be allowed to DNA test a black ski mask with the word "Police" on it (State's Exhibit 211) and black knit cap with the "8 Ball" logo on it (State's Exhibit 215) because exculpatory results will show by a preponderance of the evidence that he never would have been convicted. With the hats alone, we reiterate Appellant cannot make this showing.

Contrary to Appellant's assertion, his confession is properly considered in determining whether he has met his burden under Article 64.03(a)(2)(A). Article 64.03(b) by its plain language only prohibits the convicting court from finding that identity was not an issue at trial under Article 64.03(a)(1)(C) solely on the basis that the defendant pleaded guilty or nolo contendere or made a confession or similar admission. It does not preclude the convicting court from considering a convicted person's confession

or similar admission in making its determination under Article 64.03(a)(2)(A).

Further, the trial court did not abuse its discretion in disregarding Bocanegra's affidavit or the evidence that Appellant presented in his subsequent habeas application in making its determination under Article 64.03(a)(2)(A). First, the trial court acted within its discretion in finding that Bocanegra's affidavit was not credible. Whether Bocanegra's post-trial affidavit is consistent with or contradicts his earlier statement to police is beside the point. The court reasonably expressed skepticism at the post-trial assertions that Bocanegra—Appellant's fellow gang member and accomplice—gave in an attempt to exculpate Appellant without further inculpating himself in the offense. *See Drew*, 743 S.W.2d at 288.

Second, neither Bocanegra's affidavit nor the evidence that Appellant presented in his subsequent habeas application about the veracity of his confession are properly considered in making the Article 64.03(a)(2)(A) determination. In making that determination, we do not consider post-trial factual developments. *Reed v. State*, 541 S.W.3d 759, 774 (Tex. Crim. App. 2017). "Instead, we limit our review to whether exculpatory results 'would alter the landscape if added to the mix of evidence that was available at the time of trial.'" *Id*. (quoting *Holberg v. State*, 425 S.W.3d 282, 287 (Tex. Crim. App. 2014)). In addition, we dismissed Appellant's subsequent application as an abuse of the writ without reviewing the merits of the claims he raised therein; therefore, any evidence presented in that subsequent application was not properly before the trial court in ruling on Appellant's motion for post-conviction DNA testing.

In cases involving accomplices, a defendant can only meet his burden under Article 64.03(a)(2)(A) if he can show that testing, if exculpatory, will establish that he did not commit the crime as either a principal or a party. *See Gutierrez*, 337 S.W.3d at 900; *see also Wilson v. State*, 185 S.W.3d 481, 485 (Tex. Crim. App. 2006) (stating that, even if DNA testing showed that an additional perpetrator was involved, it would have "no effect whatsoever" on the appellant's conviction as a party). Appellant's statement to the police, coupled with Gutierrez's trial testimony, is highly probative of his guilt as a principal (as the man who actually shot Jerry Hidalgo). But Gutierrez denied that the man giving orders in her house and who shot Jerry wore either a black ski mask with the word "Police" written on it or a black knit cap with an "8 Ball" logo. Thus, the existence of a third party's DNA profile on either of these two items of evidence does not exculpate Appellant of committing Jerry Hidalgo's murder as a principal or a party.

Under the circumstances, Appellant has not established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing of the two items at issue. Given the number of accomplices, murdered victims, party liability, testimony of the Aunt, admitted physical evidence, and Appellant's confession, the hats could not have produced true exculpatory evidence in this case. Thus, he has not met Article 64.03(a)(2)(A)'s requirements and the trial court properly denied DNA testing. Appellant's points of error one and two are overruled.

Having determined that Appellant failed to meet his burden under the statute, we affirm the convicting court's order denying the motion for forensic DNA testing pursuant

to Texas Code of Criminal Procedure Chapter 64.

Delivered:    May 5, 2021

PUBLISH